# United States Court of Appeals
## For the First Circuit

No. 07-2277

UNITED STATES OF AMERICA,

Appellee,

v.

RAFAEL A. GONZÁLEZ-VÉLEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. Senior District Judge]

Before

Lynch, Chief Judge,
Torruella and Selya, Circuit Judges.

María H. Sandoval, for appellant.
Thomas F. Klumper, Assistant United States Attorney, with whom
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, and Rosa Emilia Rodríguez-Vélez, United States
Attorney, were on brief for appellee.

November ##, 2009

**TORRUELLA**, **Circuit Judge**. In this appeal, defendant-appellant Rafael A. González-Vélez ("González-Vélez") challenges his sentence following his conviction for participating in a conspiracy to distribute narcotics. The 135-month sentence currently on appeal was imposed on re-sentencing after a previous decision by this court, in which we affirmed the appellant's conviction but vacated his sentence due to the sentencing court's failure to make an individualized drug quantity determination. See United States v. González-Vélez, 466 F.3d 27 (1st Cir. 2006). After careful consideration, we affirm the appellant's new sentence.

## I. Background

As discussed in our prior opinion, the facts underlying this appeal arise from an investigation of the drug point known as "Las Malvinas" in the Luis Lloréns Torres housing project in Puerto Rico. José Luis Rivera González, a/k/a "Luis Lloréns," ("Luis Lloréns") ran the drug point from 2000 until his death in 2002. The FBI and the Puerto Rico Police Department ("PRPD") investigated the drug point between the summer of 2001 and October 2002. The investigation resulted in a grand jury indictment against nine individuals, including the appellant. González-Vélez was charged with one count of conspiracy to distribute controlled substances, including powder cocaine, cocaine base, heroin, and marijuana, in violation of 21 U.S.C. § 846. González-Vélez's role in the charged

conspiracy was that of a wholesale supplier of drugs, particularly powder cocaine, to the drug point.

González-Vélez was tried jointly with José A. Ramos-Romero ("Ramos"), a processor of drugs at Las Malvinas. In addition to asking the jury to render a verdict as to the defendants' participation in the conspiracy, the judge also gave the jury a special verdict form asking it to decide whether or not the amount of cocaine involved in the conspiracy was at least five kilograms. The jury found González-Vélez and Ramos guilty of conspiracy, and also found that the amount of cocaine in the conspiracy was at least five kilograms.

On December 23, 2004, the district court held a sentencing hearing for González-Vélez. The Pre-Sentence Report ("PSR") recommended a Base Offense Level ("BOL") of 32, based on the jury's finding that the drug quantity in the conspiracy was at least five kilograms. The district court adopted this reasoning and assigned a BOL of 32. González-Vélez had argued to the court that it needed to make an individualized drug quantity determination, but the court concluded that drug quantity was a matter reserved to the jury, and that the jury had rendered a sufficient finding.

González-Vélez also objected to the PSR on the ground that he was entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E.1. After the verdict and before

-3-

the December 23, 2004 sentencing hearing, González-Vélez had submitted to the court a written statement admitting to participating in the sale of drugs at the Lloréns Torres housing project, stating that he was sorry for the damage he had done to society and to his family, and explaining that he had gone to trial only because the drug amount with which he was being charged overstated his role in the conspiracy. The probation officer who prepared the PSR recommended that the adjustment not be granted because González-Vélez had gone to trial and because González-Vélez had indicated in an interview with the probation officer that he thought the government had a weak case. The court accepted the probation officer's view and denied the adjustment, noting that González-Vélez "went to trial at his own choice, with adequate counsel," and saying that it would not "take into consideration" the fact that the pre-trial plea negotiations were "not fruitful." Based on a BOL of 32 and a criminal history category of I, the applicable Sentencing Guidelines sentence range ("GSR") was calculated to be 121 to 151 months' imprisonment; the court sentenced González-Vélez to 135 months. González-Vélez timely appealed.

In his first appeal, González-Vélez challenged both his conviction and his sentence. In challenging his conviction, González-Vélez argued, inter alia, that the judge erred in asking the jury to render a special verdict as to the conspiracy-wide

-4-

cocaine amount. Instead, González-Vélez argued, the judge should have asked the jury to render special verdicts as to the amount of cocaine each defendant handled <u>individually</u>. González-Vélez did not challenge the jury's finding that the conspiracy involved at least five kilograms of cocaine. In challenging his sentence, González-Vélez argued that the district court should have made an individualized drug quantity determination for sentencing purposes.

In our decision in González-Velez's first appeal, we upheld his conviction, but vacated the sentence and remanded the case for re-sentencing. As to the conviction for conspiracy, we held that the court's instruction to the jury to find the conspiracy-wide amount of cocaine did not constitute error because the conspiracy-wide amount was a factor in sentencing, rather than a factor in conviction.[1] <u>González-Vélez</u>, 466 F.3d at 36. As to the sentence, however, we held that the district court's failure to make an individualized finding as to drug quantity was reversible error. <u>Id.</u> at 38. We noted that in a conspiracy case, the district court can rely on the conspiracy-wide drug quantity determination, rather than an individualized drug quantity determination, for the "<u>statutory maximum</u> penalty." <u>Id.</u> at 36 (emphasis added). Specifically, we noted that any sentence longer

---

[1] González-Vélez also challenged his conviction on the ground that there was insufficient evidence of his participation in the conspiracy. We rejected this argument, noting that there was abundant evidence in the record of González-Vélez's participation in the conspiracy. <u>Id.</u> at 37-38.

than the maximum corresponding to the conspiracy-wide amount could trigger review under Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004), which require a jury to make an individualized factual finding for any element that increases a sentence beyond the statutory maximum. González-Vélez, 466 F.3d at 36-37. In González-Vélez's case, however, the sentencing court relied on the jury's conspiracy-wide drug quantity determination to calculate the actual sentence (by using the conspiracy-wide quantity to compute the BOL), rather than the maximum sentence. We found that this contravened our holding in United States v. Colón-Solís that "when a district court determines drug quantity for the purpose of sentencing a defendant convicted of participating in a drug trafficking conspiracy, the court is required to make an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant." United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004), quoted in González-Vélez, 466 F.3d at 38. In reaching this conclusion, we further specified that "all of the drugs in a conspiracy may not be automatically assigned to an individual defendant." Id. (emphasis added) (citing United States v. Sepúlveda, 15 F.3d 1161, 1197 (1st Cir. 1993)).

Because of the sentencing error, we remanded the matter of González-Vélez's sentence "for an individualized determination of drug quantity attributable to [González-Vélez]." Id. at 41.

-6-

However, "[w]ith respect to all other matters, we affirm[ed] the district court." Id. (emphasis added).

Upon remand for re-sentencing, the district court held a pre-sentence hearing on March 27, 2007, where new evidence bearing on drug quantity was presented, followed by a sentencing hearing on July 12, 2007, where legal arguments were made and a new sentence rendered by the court. The same judge who had presided over González-Vélez's criminal trial also presided over the new round of pre-sentence and sentencing hearings. At the pre-sentence hearing, the court advised González-Vélez that the case had been remanded by the appeals court for the sole purpose of making an individualized drug quantity determination and that the prior objections to the PSR had been addressed at the original sentencing hearing. González-Vélez nevertheless renewed his request for a two-level downward adjustment for acceptance of responsibility. The court ultimately concluded, based on its examination of the sentencing memoranda and the evidence presented during the trial and the various sentencing hearings, that González-Vélez "handled, anticipated handling, or could reasonably foresee the possession with intent to distribute of more than five but less than 15 kilos of cocaine," and explained its reasons for the determination. As before, that determination corresponded with a BOL of 32, which in turn resulted in a GSR of 121 to 151 months' imprisonment. The

court again selected the 135-month sentence previously imposed. González-Vélez now appeals this sentence.

As González-Vélez's main argument on appeal challenges the district court's individualized drug quantity determination for sentencing purposes, we summarize the evidence in the record relevant thereto.

## A. Testimony of Ángel Obregón

One of the government's key witnesses at both González-Vélez's criminal trial and at the pre-sentence hearing was Ángel Obregón ("Obregón"). Obregón testified at the March 27, 2007 pre-sentence hearing that he worked under Luis Lloréns at Las Malvinas. Obregón testified about drug sales at Las Malvinas in various proceedings: before the Grand Jury in 2003, at González-Vélez's criminal trial, and at the March 27, 2007 pre-sentence hearing. At the criminal trial and before the grand jury, Obregón indicated that there were at least four retail drug sellers at the drug point. Obregón also testified at the trial that Luis Lloréns told him that the drug point sold 1/8 kg of cocaine per week. Obregón testified at the pre-sentence hearing that he saw González-Vélez at the drug point "almost everyday," and that whenever González-Vélez came to the drug point, Luis Lloréns would pay González-Vélez with money from drug sales at the drug point.

Obregón testified about González-Vélez's cocaine sales to Luis Lloréns a total of six times in various proceedings. On each

occasion he was asked in what quantity González-Vélez sold cocaine to Luis Lloréns. On the first occasion, before the Grand Jury in 2003, Obregón said González-Vélez provided one-eighth kilogram quantities ("eighths"). However, in later proceedings, Obregón testified that González-Vélez supplied cocaine in both eighths and one-half kilogram ("half") quantities. Furthermore, at the criminal trial, Obregón admitted that he did not know the difference between an eighth, a half, and one kilogram of cocaine. Obregón also gave inconsistent testimony about how many times he saw González-Vélez sell cocaine to Luis Lloréns. At the trial, Obregón initially said he did not remember how many sales he witnessed. Later, he said he saw more than 10 sales. Later still, he testified that he had only seen González-Vélez sell drugs "a couple of times."

At the March 27, 2007 pre-sentence hearing, on cross-examination by González-Vélez's counsel, Obregón admitted that he had an extensive history of violent crimes and that he was cooperating with the government. Defense counsel also challenged Obregón's credibility by pointing out that at the trial, Obregón said he did not know the difference between one eighth, one half, and one kilogram. Obregón responded that he did know that an eighth of a kilogram is less than one kilogram. Obregón was also unable to correctly calculate his age, claiming he was 15 or 16 in 1998 but that he was only 22 as of March 27, 2007.

## B. Testimony of Héctor Luis Rivera-González

Héctor Luis Rivera-González ("Rivera-González") was the nephew of Luis Lloréns. He testified at the March 27, 2007 pre-sentence hearing that he worked as a drug peddler at the drug point for a total of 32 days, from April 8, 2002 until he was arrested for robbery on May 10, 2002. Rivera-González testified that while he worked at the drug point, it was open every day and that it sold cocaine, crack, heroin, and marijuana. He identified González-Vélez as a wholesale supplier of drugs to the Las Malvinas drug point. Rivera-González said that González-Vélez sold cocaine to Luis Lloréns on credit. Rivera-González also said he saw González-Vélez at the drug point twice a week.

Rivera-González provided certain details about the packaging of cocaine. The government asked him, "specifically referring to cocaine, powder cocaine," how cocaine was packaged and sold. Rivera-González testified that Luis Lloréns would give him "packages" of powder cocaine containing 25 "baggies" each, which would retail for $5 per "baggie." Rivera-González testified that he sold "five, six, or seven" "packages" worth of cocaine per week. After asking Rivera-González about the packaging of cocaine, the government asked, "[W]hen you would sell cocaine at that drug point, were you the only seller selling for your uncle at that drug point at the time?" Rivera-González said that he was not the only

seller, and that "three or four" other people "would sell for" Luis Lloréns at the drug point.

## C. Testimony of FBI Special Agent William Ortiz and Puerto Rico Police Agent Héctor A. Orta-González.

FBI Special Agent William Ortiz ("Ortiz") and Puerto Rico Police Agent Héctor A. Orta-González ("Orta-González") testified at the March 27, 2007 pre-sentence hearing. Both agents participated in the investigation into drug sales at Las Malvinas. Agent Ortiz testified that González-Vélez was one of four wholesale drug suppliers to Las Malvinas. Both agents testified that they frequently observed González-Vélez at the drug point. On cross-examination, both agents conceded that González-Vélez did not appear at all in the 730 hours of surveillance tape the FBI took at the drug point. However, Agent Orta testified that González-Vélez would always enter the drug point through the rear entrance, where there were no surveillance cameras.

## D. Recording By Jesús Samuel Matías-Cruz

Agent Orta also testified about the contents of a recording secretly made by Jesús Samuel Matías-Cruz ("Matías-Cruz"), who worked for Luis Lloréns at the drug point.[2] In the recording, González-Vélez can be heard talking with Luis Lloréns about the packaging and processing of cocaine, as well as about when Luis Lloréns would pay González-Vélez for cocaine the latter

---

[2] The recording itself was also part of the record before the sentencing court.

-11-

had supplied.  González-Vélez is also overheard saying that a pot that was being used by one of Luis Lloréns's workers to "cook" crack cocaine had broken.

## E. Other Evidence

The judge heard González-Vélez's allocution at the March 27, 2007 sentencing hearing.  González-Vélez stated that he had always intended to plead guilty to the conspiracy charge, but that he went to trial on the advice of his trial counsel because he could not reach an agreement with the prosecution on the amount of drugs he handled.  In order to explain his presence at Las Malvinas during the period of the investigation, González-Vélez introduced into evidence a certificate from the Puerto Rico Department of Housing and Public Administration showing that he was a resident of the Lloréns Torres housing project from 1999 until 2003.

## F. Defendant's Sentencing Memo

On April 30, 2007, prior to the sentencing hearing, González-Vélez filed a sentencing memorandum with the court.[3] González-Vélez argued that the proper amount of cocaine that could be attributed to him for sentencing purposes was one and five-sixteenth ($1^5/_{16}$) kilograms.  He reached this number by multiplying one-eighth of a kilogram -- the lowest amount that Obregón testified to seeing González-Vélez sell to Luis Lloréns -- by ten

---

[3]  González-Vélez submitted a second sentencing memorandum on May 22, 2007 that expanded on the facts presented in the first memo and provided additional legal arguments.

-- the maximum number of times Obregón said González-Vélez sold cocaine to Luis Lloréns -- and then adding the one-sixteenth of a kilogram amount mentioned in the recording by Matías-Cruz. Based on this figure, González-Vélez argued that his BOL should be 26.

**G. The District Court's Sentence**

The district court held the sentencing hearing on July 13, 2007, wherein it recognized its obligation, pursuant to this Court's mandate, "to make an individualized finding as to the amount of drugs attributable to [González-Vélez] in the instant offense of conviction." The district court then stated its determination that González-Vélez "handled, anticipated handling, or could reasonably foresee the possession with intent to distribute . . . more than five but less than 15 kilos of cocaine," and proceeded to recount its reasons for that determination. The court first noted that evidence obtained from the drug point indicated that each "baggie" of cocaine sold at the point contained one-tenth of a gram of cocaine. Rivera-González testified that each "package" contained twenty five "baggies," meaning that each package contained 2.5 grams of cocaine. Based on Rivera-González's testimony that he sold from five to seven "packages" per day, the district court concluded that "even using a conservative figure [Rivera-González] would distribute at least 35 packages a week," for a total of 87.5 grams of cocaine. However, the court also noted that both Rivera-González and Obregón testified that there

were four to five sellers at the point. Thus, the court held that the "evidence presented certainly corroborates the testimony of both [Rivera-González] and Obregón that at least one eighth [of a kilogram, or 125 grams] of cocaine was sold" per week at the drug point.

The court then recounted the testimony of Agents Orta and Ortiz that they both observed González-Vélez at the drug point on multiple occasions during the course of their investigation, which began in the summer of 2001 and was continuing until at least August of 2002. The court also relied on the recording by Matías-Cruz, in which González-Vélez is heard discussing retail drug sales and the breaking of the pot that was being used to cook crack cocaine. The court noted that González-Vélez is heard saying that he was waiting to be paid for an eighth of cocaine he had sold to Luis Lloréns. Based on this evidence, the court found that González-Vélez "knew . . . the amount of drugs being distributed and/or could reasonably foresee that those amounts were being sold at the drug point supplied by him." In reaching its conclusion, the court also found that González-Vélez "had extensive knowledge of the drug trafficking activities that took place at the Las Malvinas drug point."

In determining the proper guideline range, the court stated:

> [T]he applicable case law indicates that in a
> drug conspiracy the applicable statutory

maximum imprisonment term is derived from a conspiracy-wide perspective. That does not mean that the Defendant must have personally handled the drugs for which he is being held responsible. He could be held responsible for relevant conduct, which could include the acts of other conspiracy members, as long as their conduct was reasonably foreseeable for the Defendant.

Based on its finding that González-Vélez knew how much cocaine was being sold at Las Malvinas, the court held that "if at least one eighth of cocaine was sold every week during the ten month conspiracy . . . [González-Vélez] should be held responsible for at least five but not more than 15 kilos of cocaine." When combined with a Criminal History Category of I, the court explained, this amount of cocaine triggered a BOL of 32 and a corresponding GSR of 121 to 151 months.

The court then said that it had "reviewed the applicable guideline adjustments" and "considered the other sentencing factors set forth in [18 U.S.C. § 3553(a)]." The court also stated that it found the Pre-Sentence Report (PSR) to have "adequately applied the Guideline computations and satisfactorily reflect[ed] components of [the] offense." The court had previously held, at the March 27, 2007 hearing, that since the PSR had not changed since the original sentence was handed down, any objections to the original report that had already been ruled on were "taken care of and ruled upon by the Court." Ultimately, the court sentenced González-Vélez, as before, to 131 months.

## II. __Discussion__

González-Vélez makes two main arguments on appeal. First, he argues that the district court committed reversible error in its drug quantity determination because the evidence does not support attributing five kilograms of cocaine to him. Second, González-Vélez argues that the district court erred in failing to state its reasons for denying his request for a 2-level reduction for acceptance of responsibility.[4] González-Vélez does not challenge the jury's original finding that the conspiracy as a whole involved at least five kilograms of cocaine.

---

[4] González-Vélez makes two additional arguments, neither of which merits serious consideration.

First, he argues that the district court violated 18 U.S.C. § 3553(c)(1) by failing to explain why it chose a BOL of 32. However, 18 U.S.C. § 3553(c)(1) does not require the court to explain why it chose an __offense level__. Rather, once a court has determined a GSR __based on__ the offense level, if the sentence range exceeds 24 months, § 3553(c)(1) requires the court to explain why it chose a particular __sentence__. Thus, 18 U.S.C. § 3553(c)(1) does not come into play until __after__ a decision is made on the appropriate offense level.

Second, González-Vélez argues that the district court committed a "technical violation" by not stating in Section IV(B) of the Statement of Reasons why it chose to impose a sentence in the middle of the guideline range, and that this violation constitutes reversible error. González-Vélez does not indicate how he was prejudiced by this supposed "technical violation" in any way. Nor does he provide any support for his argument that this constitutes reversible error. We therefore treat this argument as waived. __See__ __United States__ v. __Zannino__, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

**A. Applicable Law and Standard of Review**

A trial court's "approximation of drug quantity will be upheld 'as long as it represents a reasoned estimate of quantity.'" United States v. Huddleston, 194 F.3d 214, 224 (1st Cir. 1999) (quoting United States v. Webster, 54 F.3d 1, 5 (1st Cir. 1995)). Such a determination need only be supported by a preponderance of the evidence. Sepúlveda, 15 F.3d at 1198. Moreover, the drug quantity determination "is not required to be an exact determination but rather only a reasoned estimate." United States v. Rodríguez, 525 F.3d 85, 107 (1st Cir. 2008).

However, as we explained in González-Vélez's previous appeal, in a conspiracy case, the sentencing court cannot automatically assign the conspiracy-wide amount to a defendant. See González-Vélez, 466 F.3d at 38. Rather, the sentencing court must make "an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant." Id. (quoting Colón-Solís, 354 F.3d at 103). When determining the amount of drugs attributable to a defendant for sentencing purposes, the district court may examine the charged conduct plus the "relevant uncharged conduct." United States v. García, 954 F.2d 12, 15 (1st Cir. 1992) (internal citations omitted) (emphasis added). "Relevant" uncharged conduct is conduct that is "reasonably foreseeable by the defendant and committed in furtherance of the conspiracy." Id. "'Thus, each co-conspirator is responsible not

-17-

only for the drugs he actually handled but also for the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy.'" Rodríquez, 525 F.3d at 107 (quoting United States v. Santos, 357 F.3d 136, 140 (1st Cir. 2004)).

We review the sentencing court's interpretation of the sentencing guideline de novo and its determination of facts for clear error. United States v. Sicher, 576 F.3d 64, 70 (1st Cir. 2009). The application of the guidelines is reviewed on a "sliding scale" between de novo review and clear error review "depending on whether the trial judge's conclusion is more law-oriented or more fact-driven." Id. n.6. Here, the application of the relevant sentencing guideline requires a drug quantity determination, which is a purely factual issue; therefore, it may only be set aside if it is clearly erroneous. United States v. Olivero, 552 F.3d 34, 38 (1st Cir. 2009); see also Santos, 357 F.3d at 141; United States v. Sklar, 920 F.2d 107, 110-11 (1st Cir. 1990). Under the clear error standard, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Tsoulas v. Liberty Life Assur. Co., 454 F.3d 69, 76 (1st Cir. 2006) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985)).

## B. Drug Quantity Determination

In González-Vélez's previous appeal, this court vacated his sentence and remanded to the district court with instructions to make an individualized finding as to whether he either "handled

[or] anticipated handling" five kilograms of cocaine or could "reasonably foresee" that the conspiracy would handle that amount. González-Vélez, 466 F.3d at 38.  In the instant appeal, González-Vélez argues that the district court again failed to properly carry out this obligation, and thus, clearly erred in basing his sentence on the five kilogram conspiracy-wide amount.  First, González-Vélez argues that the district court improperly relied upon the testimony of Obregón and Rivera-González in determining drug quantity, as these witnesses lacked credibility.  Second, he argues that the court erred in its calculations underlying its drug quantity determination.  In particular, he argues that the court erred in calculating both the drug amount he personally handled and the amount of cocaine sold at Las Malvinas each week.  Finally, he argues that the district court wrongly concluded that he could reasonably foresee the full amount of cocaine distributed by the conspiracy.  We address these arguments in turn.

### 1. Credibility of Obregón and Rivera-González

First, González-Vélez argues that the district court erred in relying on the testimony of Obregón and Rivera-González as the basis for its drug quantity determination because they were unreliable witnesses.  González-Vélez points out that Obregón gave inconsistent testimony both as to the number of times González-Vélez sold cocaine to Luis Lloréns and as to the amount of cocaine involved in each sale.  González-Vélez also argues that Obregón

-19-

lacked the intellectual capacity to be a reliable witness, as manifested by his inability to calculate his own age. Furthermore, González-Vélez argues that Obregón had a motive to lie because he was a cooperating witness facing charges for involvement in the conspiracy, and that he was receiving payment for his testimony. Finally, González-Vélez points to Obregón's extensive criminal history.

As for Rivera-González, González-Vélez points out that Rivera-González's testimony is based on his selling drugs at the drug point for only 32 days. Moreover, Rivera-González only personally observed one sale by González-Vélez to Luis Lloréns; all of his other knowledge was hearsay testimony based on what Luis Lloréns, who died in 2002, purportedly told him.

A district court has broad discretion to make credibility judgments relevant to sentencing. See, e.g., Huddleston, 194 F.3d at 224; Webster, 54 F.3d at 5. We will overturn a district court's credibility determination only if "we have a definite and firm conviction that a mistake has been committed." United States v. Jones, 187 F.3d 210, 214 (1st Cir. 1999) (internal quotation marks omitted). A mistake may have been made if "[d]ocuments or objective evidence . . . contradict the witness's story," or if the story is "'so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it.'" United States

v. Henderson, 463 F.3d 27, 32 (1st Cir. 2006) (quoting Anderson, 470 U.S. at 575).

We find that "[w]ithin wide limits, not exceeded here, it was the exclusive role of the trial court to decide the weight to give [Obregón and Rivera-González's] testimony and whether to use it as the basis of its drug quantity determination." Rodríguez, 525 F.3d at 108 (holding that sentencing court did not clearly err in relying on testimony of witness who was "not especially exact in his description of dates, times, weights, and numbers"). We acknowledge that there are some internal inconsistencies in the testimonies as to the number of times González-Vélez sold cocaine and the amount of cocaine González-Vélez sold each time. In particular, we note Obregón's inconsistent testimony about the quantity of drugs González-Vélez sold to Luis Lloréns. However, the judge, as the finder of fact at sentencing, was free to disregard inconsistent portions of the testimony and credit the relevant credible portions. See United States v. Lara, 181 F.3d 183, 204 (1st Cir. 1999) (stating that fact-finders "are not required to discard testimony that appears to contain internal inconsistencies, but may credit parts of a witness's testimony and disregard other potentially contradictory portions").

There is, moreover, a further distinction here. The sentence in this case was not based on the amount of cocaine González-Vélez individually handled. Rather, the sentence was

based on González-Vélez's ability to foresee the conspiracy-wide amount of cocaine. With respect to this aspect of the case, Obregón's and Rivera-González's testimonies are generally consistent, are not implausible on their face, and are not contradicted by the other evidence in the record. Both witnesses testified to seeing González-Vélez at the drug point frequently, and this testimony was corroborated by Agents Ortiz and Orta. Both witnesses also testified that González-Vélez sold cocaine on credit to Luis Lloréns, which is something that González-Vélez himself admits. Furthermore, as we discuss in more detail below, Obregón and Rivera-González corroborated each other's testimony about the amount of cocaine retailed at Las Malvinas. Because the testimony of Obregón and Rivera-González was consistent as to the two important factors in González-Vélez's sentence -- the conspiracy-wide amount, and the fact that González-Vélez could foresee that amount -- we do not find the trial court's reliance on their testimony to be "unreasonable." See Huddleston, 194 F.3d at 224 (holding that "[n]otwithstanding some minor discrepancies in [witness's] testimony, 'we do not think it unreasonable . . . to believe that the testimony of a man experienced in drug deals was sufficient to establish an appropriate drug quantity'" (quoting United States v. Natanel, 938 F.2d 302, 312-13 (1st Cir. 1991)).

## 2. Calculations Underlying Drug Quantity Determination

González-Vélez next argues that even if the district court properly credited Obregón's testimony, it was obligated to calculate the drug quantity attributable to González-Vélez using the lowest amount that Obregón said González-Vélez sold per transaction -- which was one-eighth of a kilogram. González-Vélez relies on the Third Circuit's decision in United States v. Miele, 989 F.2d 659 (3d Cir. 1993), in which that court remanded the case for re-sentencing because of the lower court's failure to explain why, when deciding the defendant's sentence, it chose to rely on the larger of two drug quantities testified to by a witness. In the present case, González-Vélez argues, the district court should have multiplied one-eighth of a kilogram by the number of times González-Vélez sold cocaine and then added the one-sixteenth of a kilogram referenced in the recording by Matías-Cruz. This would yield one and five sixteenth ($1^{5}/_{16}$) kilograms, not five, and result in a BOL of only 26 instead of 32.

We need not reach this issue because the district court did not base its drug quantity determination on the amount of cocaine that González-Vélez personally handled. Instead, the court arrived at the five kilogram figure based on its determination that the minimum total amount of cocaine sold at the Las Malvinas drug point in the course of the conspiracy was five kilograms. Because, as explained below, we find no clear error in the district court's

determination that González-Vélez could foresee that five kilograms of cocaine were involved in the conspiracy, we need not concern ourselves with how much cocaine González-Vélez personally supplied to the operation. We need not address Miele because Miele deals with a drug quantity determination that was based on what the defendant personally handled, rather than on what the defendant could foresee. 989 F.2d at 666.

González-Vélez also argues that the district court performed "shoddy arithmetic" in calculating that the drug point sold an eighth of a kilogram of cocaine per week. First, González-Vélez argues that the district court incorrectly calculated the amount of cocaine individually sold by Rivera-González. The court noted that according to evidence seized at the drug point, a gram of cocaine would be packaged into ten $10 bags of cocaine, meaning that each $10 bag would contain a tenth of a gram. However, Rivera-González testified that the "baggies" he sold retailed for $5. Therefore, González-Vélez argues, each of the "baggies" Rivera-González sold must have contained one twentieth of a gram, not one tenth. Thus, if each "package" contained 25 "baggies" and Rivera-González sold between 35 and 49 packages per week, then Rivera-González himself sold between 43.75 and 61.25 grams of cocaine per week, far less than the minimum of 87.5 grams that the court calculated.

González-Vélez then notes that the district court reached its figure of one eighth of a kilogram sold per week by multiplying the amount of cocaine Rivera-González sold by the number of retail sellers that Rivera-González said were working at the drug point. González-Vélez argues, however, that doing so was clearly erroneous because Rivera-González did not explicitly state at the March 27, 2007 sentencing hearing that the other sellers sold powder cocaine. It is undisputed that the drug point sold heroin, crack, and marijuana as well as cocaine. González-Vélez argues that because Rivera-González did not clearly state that the other sellers sold cocaine, the district court was obligated to calculate total cocaine sales assuming that Rivera-González was the only person at the drug point who sold powder cocaine. This would mean that there were weekly sales of only 61.25 grams of cocaine, which is roughly one sixteenth of a kilogram rather than one eighth.

We find no clear error in the district court's determination that the drug point sold an eighth of a kilogram of cocaine per week. González-Vélez's argument hinges on the fact that Rivera-González did not explicitly state at the March 27, 2007 hearing that the other sellers at Las Malvinas sold cocaine. However, it is clear from the record that the government's examination of Rivera-González at that hearing explicitly focused on cocaine. At no point in his testimony did Rivera-González suggest that he was the only seller of powder cocaine. In

addition, there is no evidence to indicate that the other sellers did _not_ sell cocaine, or to indicate that they sold substantially less cocaine than Rivera-González.  It is therefore reasonable to interpret Rivera-González's testimony as indicating that the other sellers sold cocaine in similar quantities.  Thus, even using González-Vélez's figure of between 43.75 and 61.25 grams sold by Rivera-González, it was not unreasonable for the court to conclude that all four sellers combined sold at least 125 grams per week.  Moreover, the 125 gram figure was corroborated by Obregón's testimony.  Finally, we note that the district court's calculation is consistent with the jury's finding that the overall conspiracy involved at least five kilograms of cocaine, although the jury's finding was insufficient alone to determine the amount reasonably foreseeable.  Given that the district court's calculation of 125 grams per week was a perfectly "permissible view[] of the evidence," we cannot say that it was "clearly erroneous," and hence we will not overturn the district court's finding.  See _Tsoulas_, 454 F.3d at 76.

There is another, essentially independent point.  As we discuss below, the district court ultimately concluded that González-Vélez could reasonably foresee the _total_ amount of cocaine involved in the conspiracy. Thus, the  quantity of cocaine that is relevant in this case is the total quantity of cocaine, not merely the amount retailed at Las Malvinas in powder form.  The jury in

González-Vélez's criminal trial found that the conspiracy-wide amount of cocaine was at least five kilograms, and this finding has never been questioned in either of González-Vélez's appeals. Therefore, even if the district court erred in its calculation of how much powder cocaine was sold per week, and we do not believe it did, we would still uphold the sentence so long as we found that the district court correctly attributed the conspiracy-wide amount to González-Vélez. As discussed below, we find that the court was correct.

### 3. Attribution of Conspiracy-Wide Amount to González-Vélez

Finally, González-Vélez argues that attributing the full conspiracy-wide amount of five or more kilograms of cocaine to him was clearly erroneous as it was not established that the conspiracy-wide amount was foreseeable by him. The district court based its determination that González-Vélez could reasonably foresee five or more kilograms on two primary factors. First, the court noted that González-Vélez was frequently seen at or near the Las Malvinas drug point. Second, the court noted that in the recording made by Matías-Cruz, González-Vélez could be overheard asking Luis Lloréns about cocaine sales and discussing the pot that broke while "Joey Oreja" was using it to cook crack.

González-Vélez does not dispute that he was occasionally present at or near the drug point or that he talked to people at the drug point. However, he argues that his mere presence at Las

Malvinas cannot be used to tie him to drug sales. He notes that he had lawful reasons for being at Las Malvinas, as he lived in the Lloréns Torres housing project. He was also a friend of Luis Lloréns and other persons involved with Las Malvinas, and at one point was also romantically pursuing a woman who lived in the area. Therefore, he argues, his presence at the drug point cannot be considered "relevant conduct," García, 954 F.2d at 15, for the purposes of sentencing.

González-Vélez also argues that the district court improperly used his presence at Las Malvinas to tie him to retail drug sales, which were beyond the scope of his role in the conspiracy as a wholesale drug seller. Although his brief is unclear, González-Vélez appears to argue that where a sentence depends on quantity, a person charged for a particular role in a conspiracy can only be sentenced for the conspiracy-wide quantity if he had a supervisory role or had multiple roles in the conspiracy. He makes this argument by attempting to distinguish his case from other cases in which this court has upheld the attribution of conspiracy-wide amounts to defendants who had multiple roles or high-level roles in a conspiracy. See United States v. Pizarro-Berríos, 448 F.3d 1, 8-9 (1st Cir. 2006) (court attributed full amount of financial loss in a credit card fraud scheme to defendant who was both a purchaser of merchandise for the scheme and a bodyguard for one of the scheme's leaders); United

<u>States</u> v. <u>Rodríguez</u>, 162 F.3d 135, 140, 149 (1st Cir. 1998) (court attributed full amount of crack cocaine in conspiracy to defendant who controlled the drug point at which the narcotics were distributed). Here, González-Vélez does not dispute that he was at times present at Las Malvinas for illegal activity. However, he argues that there is no evidence that he participated in retail sales at Las Malvinas or that he could reasonably foresee the quantity of cocaine sold there. He notes that in 730 hours of videotape collected by the FBI, he was never seen at the drug point at all, much less seen retailing drugs. He admits that he went to the drug point to collect money, but he argues that this was because he sold cocaine to Luis Lloréns on credit and had to go to the drug point to be paid. González-Vélez argues that this arrangement also explains why he was recorded asking Luis Lloréns how much money Luis Lloréns could make from selling cocaine on the street, and asking, "[W]here are my Washingtons?"[5]

Since his sole role in the conspiracy was as a wholesaler, González-Vélez argues that he cannot be sentenced for the full five kilograms of cocaine unless he either personally supplied or conspired to supply that amount to the drug point. The government conceded at the sentencing hearing that it could directly attribute less than two kilograms of cocaine to González-Vélez. Furthermore, the testimony of various government witnesses

---

[5]  A slang term for $1 bills.

-29-

indicated that there were at least three other suppliers, and there was no evidence that González-Vélez conspired with them. Therefore, González-Vélez argues, the district court should have determined the amount attributable to him by dividing five kilograms by the total number of suppliers to the point.

We find no error, let alone clear error, in the district court's finding that "[i]t is evident that [González-Vélez] knew . . . and/or could reasonably foresee" that at least five kilograms of cocaine would be sold at Las Malvinas. We acknowledge that González-Vélez was sometimes present at Las Malvinas for lawful purposes, that there is no evidence of cooperation between him and the other suppliers to Las Malvinas, and that there is no evidence he was involved in retail sales at the point. Nevertheless, the evidence relied on by the district court is clearly sufficient to support the court's conclusion that González-Vélez "had extensive knowledge of the drug trafficking activities that took place at [Las Malvinas]." The district court noted that González-Vélez was frequently seen at Las Malvinas, that he sold cocaine to Luis Lloréns on credit, and that he was recorded "discussing the intricacies of the drug trade." In light of this evidence, we find no error in the district court's conclusion.

That González-Vélez's only role in the conspiracy was as a wholesale supplier, as opposed to a retailer, is of little importance to this case. In a drug distribution case, "the

quantity of drugs attributable to [a defendant] for sentencing purposes . . . [is] bounded initially by the sum of the charged conduct . . . plus his <u>relevant</u> uncharged conduct." <u>United States v. Bradley</u>, 917 F.2d 601, 604 (1st Cir. 1990) (emphasis added).  In this case, the conspiracy charged was a conspiracy to distribute drugs <u>at</u> Las Malvinas, rather than <u>to</u> Las Malvinas.  Thus, retail drug sales could clearly be relevant uncharged conduct for the purposes of the drug quantity determination.  What matters in this case is whether the retail sales were "acts that were reasonably foreseeable" by González-Vélez "in furtherance of the conspiracy" to distribute drugs at Las Malvinas.  <u>Sepúlveda</u>, 15 F.3d at 1197.  Because we find no error in the district court's determination that the retail sales were acts reasonably foreseeable by González-Vélez in furtherance of the conspiracy, we find no error in the attribution of the full five kilograms of cocaine to González-Vélez.[6]  We therefore affirm the district court's calculation of a BOL of 32.

---

[6] Moreover, contrary to González-Vélez's argument, this court has never held that a quantity attributable to a conspiracy member is dependent on either the number of roles he had or the supervisory nature of his role.  The cases on which González-Vélez relies to support this proposition, if properly read, do not help him.  In <u>Pizarro-Berríos</u>, we did not hold the defendant responsible for the conspiracy-wide financial damages merely because he had multiple roles; rather, we held that because the defendant was a friend of one of the heads of the scheme and served as his bodyguard, the defendant was in a position to know how much money was being stolen.  448 F.3d at 8-9.  In <u>Rodríguez</u>, defendant Rodríguez's role as controller of the drug point made it clear that he could foresee how much crack was sold there.  162 F.3d at 140, 149.

## C. Denial of the 2-Level Reduction for Acceptance of Responsibility

González-Vélez argues that the district court committed reversible error by failing to explain why it denied his request for a two-level reduction in his offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. González-Vélez argues that his eligibility for the reduction was a disputed issue of fact, and hence that the district court violated Fed. R. Crim. P. 32(i)(3)(B) by failing to rule on his request.[7]

Under Fed. R. Crim. P. 32(i)(3)(B), the sentencing court must, for any disputed matter, "rule on the dispute or determine that a ruling is unnecessary."  We review a district court's compliance with Fed. R. Crim. P. 32 de novo, and will remand if an error occurred that was not harmless.  United States v. Guadalupe-Rivera, 501 F.3d 17, 22 (1st Cir. 2007).  We review a district court's judgment about acceptance of responsibility for clear error.  United States v. Deppe, 509 F.3d 54, 60 (1st Cir. 2007).

---

[7]  González-Vélez also argues that the alleged failure to rule on the acceptance of responsibility issue violates 18 U.S.C. § 3553(c)(1).  We need not address this argument in detail because 18 U.S.C. § 3553(c)(1) does not apply to rulings on acceptance of responsibility under U.S.S.G. § 3E1.1.  Section 3553(c)(1) applies to the court's choice of a sentence within a guideline range. See supra n.4.  In contrast, U.S.S.G. § 3E1.1 affects the offense level, from which the GSR is calculated.  Thus, 18 U.S.C. § 3553(c)(1) does not come into play until after a decision is made on the appropriate offense level.

Here, we find no error in the district court's compliance with Fed. R. Crim. P. 32(i)(3)(B). The PSR before the district court upon remand for re-sentencing was the same report that was used in González-Vélez's original sentencing. At the March 27, 2007 pre-sentence hearing, the court stated that because the PSR was "the same as the last time . . . any objections that were made at the last time and taken care of . . . were taken care of and ruled upon by the Court." The court then allowed González-Vélez's counsel to present her objections again, "if she feels it's necessary." In response, González-Vélez's counsel stated that she and her client "renew[ed] [their] request for granting points [sic] for acceptance of responsibility."

It is clear that the request for a reduction at the March 27, 2007 hearing was not a new objection, but rather a reiteration of a previous objection. Therefore, it was correct for the district court to rest on its previous resolution of this issue. Moreover, the district court properly complied with Fed. R. Crim. P. 32(i)(B)(3) when it addressed the responsibility issue at the original sentencing hearing. At that hearing, the court had noted that González-Vélez "went to trial at his own choice, with adequate counsel." González-Vélez had argued that the fact that he went to trial should not be held against him, because he could not reach an agreement with the prosecutor regarding drug quantity. However, the court had said that it would not "take into

consideration" the fact that the pre-trial plea negotiations were "not fruitful." As we note below, a criminal defendant's choice to go to trial weighs very heavily against granting a downward adjustment for acceptance of responsibility; only in rare circumstances can the defendant overcome this effect, and the failure of plea negotiations is generally not such a circumstance. In light of this reality, we find the district court's discussion of the responsibility issue at the original hearing sufficient for the purposes of Rule 32(i)(B)(3). Because the district court had already ruled on the responsibility issue in compliance with Rule 32(i)(B)(3) at the original sentencing hearing, we find no error in the district court's decision not to address the issue again at the March 27, 2007 pre-sentence hearing.

### III. <u>Conclusion</u>

For the reasons stated above, we affirm the district court's sentence.

**<u>Affirmed</u>**.