**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 16-1471

UNITED STATES OF AMERICA,

Appellee,

v.

KENDALL FRANCIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Howard, Chief Judge,
Stahl and Lynch, Circuit Judges.

Scott Katz and Scott Katz Law on brief for appellant.
Thomas E. Delahanty II, United States Attorney, and Renée M.
Bunker, Assistant United States Attorney, on brief for appellee.

June 7, 2017

**STAHL**, **Circuit Judge**.    Defendant-appellant Kendall Francis pled guilty to one count of conspiracy to distribute heroin and cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B), and was later sentenced to 108 months' imprisonment. On appeal, Francis asserts that his sentence was procedurally unreasonable because the district court relied on clearly erroneous facts when calculating his United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") offense level and sentencing range.  Finding his arguments unpersuasive, we affirm.

**I.**

Because Francis appeals following a guilty plea, we draw the facts from the plea agreement, the presentence report ("PSR"), and the sentencing transcript.  See United States v. King, 741 F.3d 305, 306 (1st Cir. 2014).  Beginning in 2014, a multi-agency investigation uncovered evidence that several individuals were transporting narcotics from New York to Lewiston, Maine for resale. As the investigation progressed, law enforcement concentrated on Francis, nicknamed "Dew," and some of his possible associates, including (among others) Christian Dent, Rebecca Thompson, Naquan Eley, Randy Gosselin, and Corinthian Wright.[1]  These efforts led investigators to Thompson and Dent's Lewiston apartment, located

---

[1] We have affirmed Wright's sentence in a companion opinion issued on the same date as this opinion. United States v. Wright, No. 16-1508, ___ F. App'x ___ (1st Cir. June 7, 2017).

- 2 -

at 53 Shawmut Street. Thompson informed law enforcement of this apartment after she claimed, in an interview conducted while police detained her on another matter, that Wright had "invested" in her and her boyfriend Dent, had rented the apartment for them, and had thereafter, along with her and Dent, sold cocaine and heroin from the apartment. Thompson later testified that Francis and Eley remained in, and sold drugs from, the 53 Shawmut Street apartment even after she and Dent moved out.

Further investigatory efforts revealed that Wright had also rented another nearby Lewiston apartment in November 2014, a third-floor residence located at 174 Blake Street.[2] The landlord of that residence, meanwhile, identified Francis as having paid him the December rent for that apartment. Investigators also learned that two other nearby apartments had recently been vacated: a fourth-floor apartment located at 174 Blake Street and a fourth-floor apartment located at 172 Blake Street. These two apartments, although located in separate buildings, were connected by an exterior walkway.[3]

---

[2] Statements from the property manager established that Wright had changed the locks shortly after he began renting the apartment.

[3] Presumably based in part on Thompson's claims, investigators searched the 53 Shawmut Street apartment on December 10, 2014. They found no drugs or firearms in the apartment at that time. However, the search did yield a key, which investigators later learned opened both the third- and fourth-floor apartments at 174 Blake Street.

With this new information, law enforcement refocused their efforts on the three Blake Street apartments. On December 17, 2014, agents seized heroin from a female as she left the third-floor apartment at 174 Blake Street. The next day, a property manager told police that he had "found several firearms and a large amount of narcotics" in the supposedly vacant fourth-floor apartment at 172 Blake Street. Responding officers later seized 272.4 net grams of cocaine base, four handguns, and various personal effects from that apartment. Subsequent testing revealed that Wright's fingerprints were on two plastic bags that contained some of these drugs. The four firearms seized from this apartment were found "in close proximity" to these bags. Officers found one of the firearms, meanwhile, within two plastic bags, one of which had Eley's fingerprint on it. The parties further stipulated that the property manager later found a Maryland identification card in the apartment. The identification card bore Francis's name and listed his height as 5' 11".[4]

Following these discoveries, the landlord requested that law enforcement also search the fourth-floor apartment at 174 Blake Street.[5] There, officers found two backpacks. One

---

[4] Gosselin later told investigators that he had repeatedly obtained drugs from one of the Blake Street apartments, and that he had seen both Eley and Francis while engaging in these transactions.

[5] We note that although investigators, during the course of these searches, recovered DNA and fingerprint samples from the

backpack contained personal effects and 100.7 net grams of heroin, while the other contained personal effects and $8,077.51 in cash. Agents also recovered a cellular phone. Pursuant to a search warrant, agents then seized a number of text messages from the phone, including:

- An outgoing message, dated October 10, 2014, stating, "My name is dew like mountain dew."

- An outgoing message, dated November 11, 2014, stating, "i live in bmore but i work out of state."

- An incoming message, dated September 1, 2014, stating, "how tall are u," with a responsive outgoing message stating, "5 11"."

Furthermore, investigators recovered a pair of toothbrushes during these searches, one from the fourth-floor 172 Blake Street apartment and one from the fourth-floor 174 Blake Street apartment. The DNA recovered from both toothbrushes ultimately proved to be a match to Eley's DNA. The record indicates, however, that these DNA samples were the only ones recovered by investigators during the course of their searches.

On December 30, 2014, investigators learned that a gun used in a violent crime was reportedly located at 53 Shawmut Street. The landlord of that apartment let agents into the by-then vacant apartment, where a search revealed a loaded

---

fourth-floor apartments at 172 and 174 Blake Street, none matched those of Francis.

- 5 -

handgun hidden beneath the apartment's floorboards. As the government concedes, however, the PSR noted no known connection between this gun and Francis or Wright.[6]

The government then brought an indictment against Francis, charging him with (1) conspiracy to distribute heroin and more than 28 grams of cocaine base, 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B); (2) possession with intent to distribute more than 28 grams of cocaine base, 21 U.S.C. §§ 841(a)(1), (b)(1)(b); and (3) possession with intent to distribute heroin, 21 U.S.C. §§ 841(a)(1), (b)(1)(C). Francis pled guilty to the conspiracy charge,[7] and the PSR attributed to Francis the drugs and cash seized from the fourth-floor apartments at 172 and 174 Blake Street. In total, these amounts summed to 272.4 grams of cocaine base, 100.7 grams of heroin, and $8,077.51. When combined with the drugs and cash seized from the 99 Horton Street apartment, the PSR attributed 392.1 grams of cocaine base, 143.1 grams of heroin,

---

[6] Because Francis's challenges only pertain to the drugs and firearms recovered from the 53 Shawmut Street apartment and the fourth-floor apartments at 172 and 174 Blake Street, we only briefly describe the February 12, 2015 search of an apartment at 99 Horton Street in Lewiston, Maine. There, police seized -- and the district court later attributed to Francis -- 119.7 net grams of cocaine base, 42.4 net grams of heroin, and $2,351.00 from a vest found on the back of the chair in which Francis was sitting at the time of the search. Again, Francis does not dispute these amounts or the district court's attribution of these amounts to him at sentencing.

[7] The district court later dismissed Counts Two and Three of the indictment on the government's motion.

and $10,428.51 to Francis, which ultimately yielded a Guidelines base offense level of thirty. The PSR also recommended a two-level firearm enhancement based on the guns found near the drugs and cash recovered from the fourth-floor apartment at 172 Blake Street, as well as a three-level acceptance-of-responsibility reduction. These calculations resulted in a total offense level of twenty-nine, and a corresponding Guidelines sentencing range of 108-135 months' imprisonment.

Francis objected to the PSR's inclusion of the drugs and cash from the Blake Street apartments. He also disputed the application of the firearm enhancement, arguing that it should not apply "based on the 'mere fact that [his] identification card was found in an apartment where drugs and firearms were located.'" Despite these overtures, the PSR remained unaltered. At sentencing, the district court likewise rejected Francis's challenges, adopted the PSR's recommendations, and sentenced Francis to 108 months' imprisonment. This appeal followed.

## II.

Francis levies two challenges directed at the procedural reasonableness of his sentence. He first claims that the district court incorrectly attributed the drug quantities recovered from the fourth-floor apartments at 172 and 174 Blake Street to him when, in fact, the government presented "almost no evidence linking [him] with those units." For similar reasons, Francis also argues

that the district court mistakenly added a two-level sentencing enhancement for firearm possession based on the four firearms recovered from the fourth-floor apartment at 172 Blake Street and the one firearm recovered from the apartment at 53 Shawmut Street.

When assessing the procedural reasonableness of a sentence, we apply a "multifaceted" abuse-of-discretion standard that "review[s] factual findings for clear error, arguments that the sentencing court erred in interpreting or applying the guidelines de novo, and judgment calls for abuse of discretion simpliciter." United States v. Serunjogi, 767 F.3d 132, 142 (1st Cir. 2014) (quoting United States v. Leahy, 668 F.3d 18, 21 (1st Cir. 2012)). Francis, however, acknowledges that his challenges are limited to aspects of the district court's factual findings, meaning our review is only for clear error. See, e.g., United States v. Miranda-Martinez, 790 F.3d 270, 276 (1st Cir.) (reviewing a challenge to the factual findings that supported the defendant's connection to a seized firearm in the context of a drug trafficking conspiracy for clear error), cert. denied, 136 S. Ct. 430 (2015); United States v. Trinidad-Acosta, 773 F.3d 298, 317 (1st Cir. 2014) (reviewing "individualized determinations of drug quantities for clear error"). Under this lens, we find that the record contains more than enough evidence to sustain both the district court's drug quantity attribution and its firearms enhancement application.

A.    The Drug Quantity

To start, the district court supportably concluded that there was sufficient evidence connecting Francis to the drugs and proceeds recovered from the Blake Street apartments.  Under clear error review, a district court's determination regarding the drug quantity attributable to a defendant "will be upheld 'so long as the approximation represents a reasoned estimate of actual quantity.'"  United States v. Sepúlveda-Hernández, 752 F.3d 22, 35 (1st Cir. 2014) (quoting United States v. Cintrón-Echautegui, 604 F.3d 1, 6-7 (1st Cir. 2010)).  These determinations "need only be supported by a preponderance of the evidence."  United States v. González-Vélez, 587 F.3d 494, 502 (1st Cir. 2009).

Of course, "in a conspiracy case, the sentencing court cannot automatically assign the conspiracy-wide amount to a defendant.    Rather, the sentencing court must make an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant."  Id. (internal citations and quotation marks omitted).  In this context, then, foreseeability includes "not only . . . the drugs [Francis] actually handled but also . . . the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy." See United States v. Santos, 357 F.3d 136, 140 (1st Cir. 2004).

Here, the district court did not clearly err in concluding that a preponderance of the evidence established that

members of the conspiracy used the Blake Street apartments to further their drug distribution efforts and that Francis reasonably could have foreseen that the drugs and proceeds recovered from these apartments were within the scope of and in furtherance of that conspiracy. First, Thompson's statements and testimony regarding the conspiracy's operations out of the 53 Shawmut Street apartment, and the apparent abandonment of its operations at that apartment (with the exception of the gun recovered during the December 30th search), established Francis's connection to the conspiracy's drug distribution efforts in Lewiston, Maine.[8] See United States v. Díaz-Arias, 717 F.3d 1, 26-27 (1st Cir. 2013) (noting that courts may consider third-party proffer statements for sentencing purposes). Second, the record contains ample evidence connecting the conspiracy, generally, and Francis, specifically, to the Blake Street apartments. The landlord identified Wright and Francis as having paid, on separate occasions, the rent for the third-floor apartment at 174 Blake Street, and Gosselin's testimony indicated that Eley and Francis distributed drugs out of that apartment. The key found in the 53 Shawmut Street apartment, meanwhile, opened both the third- and fourth-floor apartments at 174 Blake Street, the latter of which

---

[8] The record also contains evidence that "[m]ultiple cooperation sources . . . identified . . . Wright and Francis as being among the people selling drugs from the . . . 53 Shawmut Street [apartment]."

was directly connected via an external walkway to the fourth-floor apartment at 172 Blake Street. The property manager similarly recovered an identification card bearing Francis's descriptive information from the fourth-floor apartment at 172 Blake Street, and police found a cellular phone in the fourth-floor apartment at 174 Blake Street containing text messages that suggested Francis owned the device. From this evidence, the district court was entitled to infer from "the whole of the record," United States v. Doe, 741 F.3d 217, 235 (1st Cir. 2013) (quoting United States v. Bernier, 660 F.3d 543, 545 (1st Cir. 2011)), that Francis "was aware of the capacity at which the conspiracy was operating and, thus, that the drug amount handled by the conspiracy was reasonably foreseeable to him," Trinidad-Acosta, 773 F.3d at 317.

Francis attacks each of these factual findings, claiming that none definitively establishes his connection, as opposed to his co-conspirators' connection, to the fourth-floor apartments at 172 and 174 Blake Street. To start, Francis emphasizes that the DNA and fingerprint evidence recovered from the Blake Street apartments only links Wright and Eley to those locations. Francis also asserts that because a property manager purportedly found the identification card after law enforcement had finished their search of the 172 Blake Street apartment, there is no "meaningful" link between him, the identification card, and that apartment. In a similar vein, Francis further argues that the text messages

- 11 -

recovered from the cellular phone all relate to non-drug-related matters and were dated "more than a month before the cell phone found its way into the 174 Blake Street apartment." Finally, Francis stresses that the key found at the 53 Shawmut Street apartment "adds little given that Wright . . . and others were also linked to [that] apartment."

We disagree. Francis's arguments essentially "boil down to griping about the quality of the evidence at the sentencing hearing," Doe, 741 F.3d at 235, and suggesting that the district court's drug quantity attribution is not supported by any direct evidence. Regarding the former, it is well-established that "[w]hen faced with conflicting facts relating to drug quantity, a district court is at liberty to make judgments about credibility and reliability." United States v. Demers, 842 F.3d 8, 13 (1st Cir. 2016). As to the latter, it is likewise clear that a fact-finder is entitled to rely on circumstantial evidence in drawing conclusions regarding drug quantity. See United States v. Hall, 434 F.3d 42, 61 (1st Cir. 2006).

To that effect, we believe that the circumstantial and other record evidence in this case "safely insulates the challenged finding from clear-error attack." See United States v. Sklar, 920 F.2d 107, 114 (1st Cir. 1990) (affirming the drug quantity attributed to a defendant where, as in this case, the defendant did not "suggest[] any serious methodologic flaw in the district

court's calculation").  The text messages, identification card, and key form compelling pieces of evidence from which the district court could "plausibl[y] extrapolat[e]" that Francis was connected to the Blake Street apartments and the drugs and proceeds seized therefrom.  See Cintrón-Echautegui, 604 F.3d at 7; see also United States v. Dunston, 851 F.3d 91, 101-02 (1st Cir. 2017) ("[W]here there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous." (alteration in original) (internal quotation marks omitted) (quoting United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990))).  "Far from leaving us with the unyielding feeling that a mistake has been made," the district court's well-reasoned analysis of the PSR and other record evidence "strikes us as eminently reasonable."  Doe, 741 F.3d at 238.  We therefore affirm the district court's attribution of the drugs and proceeds recovered from the Blake Street apartments to Francis.

B.    The Firearm Enhancement

Francis reiterates many of the arguments discussed above in an effort to impugn the district court's application of the Guidelines's sentencing enhancement for firearm possession, claiming that "there was essentially no evidence linking" him to the fourth-floor apartment at 172 Blake Street.  Again, we disagree.

"The Sentencing Guidelines apply a two-level enhancement to the base offense if the defendant possessed a firearm in connection with the convicted offense." Trinidad-Acosta, 773 F.3d at 320 (citing U.S.S.G. § 2D1.1(b)(1)). Because this case involves a conspiracy, Francis need not "have possessed the weapon h[im]self or even to have known about it" in order for the enhancement to apply. See United States v. Greig, 717 F.3d 212, 219 (1st Cir. 2013). Instead, the government need only prove, by a preponderance of the evidence, that it was "reasonably foreseeable that a co-conspirator would possess a weapon in furtherance of the criminal activity." Id. If the government establishes that the defendant or a co-conspirator "possessed a weapon during the offense, the defendant may avoid application of the enhancement if he can show that it is 'clearly improbable that the weapon was connected with the offense.'" Miranda-Martinez, 790 F.3d at 276 (quoting U.S.S.G. § 2D1.1 cmt. 11(A)).[9]

As noted above, the district court's finding that members of the conspiracy, including Francis, used the vacant Blake Street apartments, connected to each other via an external walkway, to store drugs and guns during the relevant time period was not

---

[9] The government argues that Francis failed to address the "clearly improbable" element in his brief and, consequently, has waived any challenge to that aspect of the district court's sentencing decision. Given that the issue is easily resolvable on the merits, we decline to decide the waiver issue.

clearly erroneous.  Francis could also reasonably foresee that one of his co-conspirators would procure and store firearms in furtherance of the criminal conspiracy, especially where, as here, investigators found the firearms in close proximity to the recovered drugs.  See, e.g., id. (stating that we have "often observed that 'firearms are common tools' in drug trafficking conspiracies involving large amounts of drugs" (quoting United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991))); United States v. Thongsophaporn, 503 F.3d 51, 59 (1st Cir. 2007) (noting that the presence of a gun at a drug distribution location "*may* allow" courts to "infer[] that the weapon was present for the protection of the drug operation" (quoting United States v. Corcimiglia, 967 F.2d 724, 727 (1st Cir. 1992))).  Therefore, it was not clearly improbable that the firearms recovered from the fourth-floor apartment at 172 Blake Street were connected with the drug conspiracy and, consequently, Francis.[10]

## III.

For these reasons, Francis's sentence is **AFFIRMED**.

---

[10] Because we rest our conclusion on the evidence connecting Francis to the firearms recovered from the Blake Street apartments, we need not address Francis's connection to the firearm recovered from the 53 Shawmut Street apartment.