# United States Court of Appeals
## For the First Circuit

Nos. 13-1830
     13-2056

UNITED STATES OF AMERICA,

Appellee,

v.

MANUEL TRINIDAD-ACOSTA,
ED COGSWELL,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, U.S. District Judge]

Before

Torruella, Dyk,* and Thompson,
Circuit Judges.

David W. Ruoff, with whom Howard & Ruoff, PLLC, was on brief,
for appellant Trinidad-Acosta.
Hunter J. Tzovarras for appellant Cogswell.
Seth R. Aframe, Assistant United States Attorney, with whom
John P. Kacavas, United States Attorney, was on brief, for
appellee.

December 5, 2014

---

\* Of the Federal Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** Defendants-Appellants Manuel Trinidad-Acosta ("Trinidad") and Ed Cogswell ("Cogswell") were convicted for their involvement in a conspiracy to distribute cocaine base (or "crack cocaine"). They appeal their convictions and sentences, citing a number of alleged trial and sentencing errors. We have reviewed their claims carefully and do not find merit in any of them. Accordingly, we affirm.

## I. Facts[1]

Sometime around September 2010, two New York residents, in coordination with a local drug dealer, set up a business for distributing crack cocaine in Bangor, Maine. The conspiracy's leader, Dawlin Cabrera ("Cabrera"), remained in New York, from where conspiracy members shipped packages of crack cocaine to Maine by bus. At its peak, the conspiracy sold close to 300 grams of crack cocaine each month. Initially, the drugs were distributed from a number of residences in Bangor, although by December 2010 the sale and storage of the crack cocaine arriving from New York was centralized in a single location: 100B Ohio Street.

The conspiracy leaders recruited a number of individuals to participate in its local Bangor operations. Among those recruited was Trinidad -- known to conspiracy members as "Fish" or "Peje." Trinidad lived at the 100B Ohio Street apartment for a

---

[1] We briefly summarize the relevant facts, reserving for our analysis a more detailed discussion of the facts relevant to each issue presented on appeal.

portion of the conspiracy's duration, participating in the storage and sale of crack cocaine at the residence.

A bank account was opened for Cabrera at the local Bank of America branch using an alias. Trinidad would deposit into that account cash proceeds from the sale of crack cocaine; Cabrera would then withdraw this money from New York City branches of the bank.

Co-defendant Cogswell, a daily crack cocaine user, participated in the conspiracy as a salesman. He would regularly purchase bundles of crack cocaine from the New York importers and resell the drug to local customers in and around Bangor. Cogswell also lived for some time at the 100B Ohio Street apartment, and he too made some cash deposits into Cabrera's bank account.

Jennifer Holmes ("Holmes") regularly purchased crack cocaine at the Ohio Street address from either Trinidad, Cogswell, or another member of the conspiracy. Holmes purchased firearms for Trinidad and for some other members of the conspiracy, for which she was compensated with crack cocaine.

By the summer of 2011, law enforcement had detected the drug distribution operation and had developed confidential informants. In November 2011, law enforcement raided the Ohio Street apartment. After some arrests were made, most of the co-conspirators provided information and agreed to cooperate; Trinidad and Cogswell did not.

A grand jury indicted Trinidad and Cogswell on one count of conspiracy to possess with the intent to distribute twenty-eight grams or more of crack cocaine, in violation of 21 U.S.C. § 841(b)(1)(B) and § 846. Trinidad was also indicted on one count of possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

Both defendants were tried together. The trial evidence consisted of testimony from multiple cooperating co-conspirators who operated out of the 100B Ohio Street apartment, each of whom identified Trinidad and Cogswell as members of the conspiracy, except for Cabrera, who identified Cogswell as a drug user and customer of the conspiracy. There was also evidence that Trinidad had signed the lease for the Ohio Street apartment, paid the monthly rent in cash, and was responsible for monitoring drugs stored in the apartment.

In addition, the government presented evidence that both defendants had deposited drug proceeds into Cabrera's bank account and that they had both made multiple crack cocaine deliveries. Finally, there was testimony from Holmes, who, following a request from Cogswell, had purchased a gun for Trinidad. This gun was recovered by the police from an apartment in which Trinidad was staying.

After a five-day trial, both defendants were found guilty as charged. At sentencing, Trinidad was found responsible for 4.9

kilograms of crack cocaine, triggering a base offense level of thirty-six. A two-level enhancement was applied under U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2D1.1(b)(12) for maintaining a premises for the purpose of distributing a controlled substance (known as the "crack house enhancement"), increasing the offense level to thirty-eight. Since Trinidad had a criminal history category of I, the applicable advisory guidelines sentencing range ("GSR") was 235-293 months of imprisonment for the conspiracy count and 60 months for the firearm count, for a total of 295-353 months. The government requested that Trinidad be sentenced to 295 months, while Trinidad asked for a 180-month sentence. Trinidad was ultimately sentenced to 240 months (180 months on Count One and the statutorily required consecutive 60 months on Count Two) -- almost five years below the low end of the GSR.

For his part, Cogswell was found responsible for 841 grams of crack cocaine, yielding a base offense level of thirty-four. The district court added a two-level obstruction-of-justice enhancement for writing a threatening letter to a testifying witness after trial, and a two-level increase for possession of a firearm, elevating the offense level to thirty-eight. He had a criminal history category of II, which resulted in a GSR of 262-327 months. Cogswell was sentenced to 180 months of imprisonment -- almost seven years below the low end of the GSR.

## II. Discussion of Trinidad's Claims

### A. Denial of Motion for a Mistrial

Trinidad argues that the district court erred in denying his motion for a mistrial. We disagree.

#### 1. Background

On January 30, 2013, Holmes testified against the defendants, as part of her cooperation agreement with the government.[2] During direct examination, Holmes identified Trinidad, who is a dark-skinned Dominican, as well as Cogswell, who is Caucasian, as people involved in the conspiracy.

When the prosecutor asked Holmes if Trinidad was in the courtroom, Holmes answered in the affirmative. When asked to describe an article of clothing that he was wearing, Holmes indicated that she could not do so, because she could not see him. The prosecutor then asked Holmes to stand up so that she could see what he was wearing from the waist up. When she stood up, Holmes immediately identified the clothing that Trinidad was wearing.

Holmes had more difficulty identifying Cogswell. Initially, Holmes said that she could not determine whether Cogswell was in the courtroom, because she was nearsighted and needed glasses, which she did not have. Holmes then walked off the

---

[2] Holmes was charged with three counts of providing false information regarding her purchases of firearms for Trinidad and other members of the conspiracy. Holmes had pleaded guilty to these charges and was awaiting sentencing.

witness stand and got closer to the people in the courtroom, but still could not identify Cogswell.  Subsequently, the prosecutor, who was also nearsighted, offered Holmes his glasses.  Upon putting on the prosecutor's glasses, Holmes testified that she could see very clearly, and identified Cogswell.

On cross-examination, Trinidad's attorney tried to attack Holmes's credibility -- regarding her identification of Trinidad -- by suggesting that Holmes identified Trinidad more easily than Cogswell because Trinidad was the only dark-skinned person in the courtroom.  Holmes, however, responded that she was able to identify Trinidad more easily because "[she] walk[s] past him every day.  [She is] in jail with him."[3]

---

[3]  The exact exchange was as follows:
     Q: When you came in and sat down, you didn't have your glasses with you, correct?
     A. No, I don't own any glasses.
     . . .
     Q: And I take it from your testimony you're nearsighted?
     A: Yeah.
     . . .
     Q: And when you first came in, within a fairly short period of time, [the prosecutor] asked you to identify the person you knew as Fish, correct?
     A: Yes.
     . . .
     Q: And you knew, based on your cocaine use, that almost all of the people that the government was interested in were black, weren't they?
     A: Hm, no.
     . . .
     Q: So who was in charge of the group?
     A: I think D was.
     Q: And in addition to D, there were some other dark-skinned individuals, weren't there?
     A: Yes.

Trinidad then moved for a mistrial on account of Holmes's statement that she walked past Trinidad every day in jail. While he recognized that Holmes's statement was made "spontaneously" and "without any assistance from the government," Trinidad argued that it was the first time that anyone had referred to him being in custody and that it warranted a mistrial because of the prejudicial effect of having the jury know that he was in custody.

The district court denied Trinidad's request for a mistrial. It noted that Trinidad's attorney was attacking Holmes's credibility and that her testimony was a direct and natural response to defense counsel's suggestion that she was able to identify Trinidad more easily than Cogswell because of Trinidad's skin color. The trial court reasoned that Trinidad could not, by his own questioning, elicit a response that he did not like and then turn around and move for a mistrial based on the response.

The government suggested that the trial court consider a limiting instruction on Holmes's answer. In response, the court noted that giving a limiting instruction could bring more attention

---

Q: We can even call them, in common parlance, black folk, can't we?
A: They're Dominican.
Q: Okay. But they are black.
A: Yes.
Q: They're not white Dominicans.
A: No.
Q: But you were -- despite your inability to see Mr. Cogswell from roughly the same distance, you could instantly identify my client.
A. I walk past him every day. I'm in jail with him.

to the testimony, which could have escaped the jury, and told Trinidad that it was completely up to him to decide whether he wanted a limiting instruction given to the jury. Trinidad decided not to request a limiting instruction.

## 2. Applicable Law and Analysis

"Declaring a mistrial is a last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair." United States v. Díaz, 494 F.3d 221, 227 (1st Cir. 2007) (quoting United States v. Sepúlveda, 15 F.3d 1161, 1184 (1st. Cir. 1993)). When reviewing the denial of a request for a mistrial, "we consider the totality of the circumstances to determine whether the defendant has demonstrated the kind of clear prejudice that would render the court's denial of his motion for a mistrial a manifest abuse of discretion." United States v. Dunbar, 553 F.3d 48, 58 (1st Cir. 2009) (internal quotation marks omitted) (quoting United States v. Freeman, 208 F.3d 332, 339 (1st Cir. 2000)). "In conducting this inquiry, we are mindful that the trial court has a superior point of vantage, and that it is only rarely -- and in extremely compelling circumstances -- that an appellate panel, informed by a cold record, will venture to reverse a trial judge's on-the-spot decision." Freeman, 208 F.3d at 339 (internal quotation marks omitted); see also United States v. Pierro, 32 F.3d 611, 617 (1st

Cir. 1994) ("Battles over the need for a mistrial most often will be won or lost in the district court."). We examine "the context of the improper remark, whether it was deliberate or accidental, the likely effect of the curative instruction, and the strength of the evidence against the appellants." United States v. Cresta, 825 F.2d 538, 549-50 (1st Cir. 1987). Deference to the district court's ruling is particularly appropriate where, as here, the request for mistrial is based on a claim that "some spontaneous development at trial may have influenced the jury in an improper manner." Díaz, 494 F.3d at 226.

Trinidad claims that Holmes's statement -- that she had seen him in jail every day -- interfered with his constitutional right to a presumption of innocence and should be considered "highly prejudicial." He offers three alleged reasons:(1) evidence that Trinidad was in jail with Holmes created the chance that the jury would infer guilt by association; (2) the jury was free to infer that Trinidad's incarceration was the result of the judicial determination of Trinidad's dangerousness or guilt; and (3) if the jury did not think that Trinidad was detained on the pending charges, they were free to speculate that he was in fact incarcerated on other charges. Trinidad contends that the trial court had no option but to order a mistrial.

Trinidad relies on Estelle v. Williams, 425 U.S. 501, 503-05 (1976), to support his proposition that a mistrial was

warranted.  In Estelle, the Supreme Court held that forcing a defendant to wear prison garb throughout his trial undermines the defendant's presumption of innocence because such clothing is a constant reminder of the defendant's condition as a pretrial detainee.  Id. at 504.  Trinidad alleges that Holmes's brief reference to his incarceration had the same effect as the prisoner clothing at issue in Estelle.  We disagree.

The possible effect on the jury of Holmes's fleeting comment regarding Trinidad's pre-trial incarceration status is markedly different from that of a defendant wearing prison clothing throughout his entire trial.  The Supreme Court held in Estelle that the clothing would be a "constant reminder" of the defendant's condition as a pretrial detainee.  425 U.S. at 504 (emphasis added).  Here, on the contrary, we are dealing with a single, isolated statement that was made and put to rest, and that did not provide any details about Trinidad's incarceration.  A number of cases -- both from this and other circuits -- support this crucial distinction and counsel that we reject Trinidad's argument.  See, e.g., United States v. De Jesús Mateo, 373 F.3d 70, 73 (1st Cir. 2004) (holding that there was no abuse of discretion in denying mistrial based on a comment that the defendant was in prison where the comment "provided the jury with little detail"); see also United States v. Deandrade, 600 F.3d 115, 118 (2d Cir. 2010) ("[T]he rule that emerges is that brief and fleeting references [to

-11-

the defendant's incarceration] are generally allowed, but extended comment is impermissible."). Moreover, Trinidad's pretrial incarceration was not mentioned by any other witness. Nor was it referenced by the government during trial.

The context in which Holmes made the comment at issue also counsels against granting a mistrial. Holmes made the comment in response to the suggestion, by Trinidad's attorney, that her identification of Trinidad was motivated by Trinidad's skin color. Faced with an attack on her credibility, Holmes felt compelled to explain that she could identify Trinidad more easily than Cogswell because she walked past him every day while she was in jail with him. It is well-established that when, as here, defense counsel elicits a response from a witness,[4] the defense cannot then "complain of the alleged error." Cresta, 825 F.2d at 552. Since the thrust of the cross-examination was an effort to undermine the basis for Holmes's identification, we hold that Trinidad did not suffer clear prejudice where Holmes merely provided the basis for her ease in making the identification, which was different than the one suggested by Trinidad.

---

[4] Although Trinidad acknowledges that Holmes's comment was elicited on cross-examination, he alleges that it was not directly responsive of the question posed to her. He claims that his question merely warranted a simple "yes" or "no" answer. We think otherwise, since her need to defend her credibility from his attack required something more than a simple "yes" or "no" -- it required an explanation. Holmes's response was a natural one given the circumstances.

Furthermore, if Trinidad really thought that Holmes's brief reference to his pretrial incarceration was so highly prejudicial, he could have accepted the district court's invitation of a curative instruction. After all, such an instruction is "ordinarily an appropriate method of preempting a mistrial." United States v. Sotomayor-Vázquez, 249 F.3d 1, 18 (1st Cir. 2001). That he decided that no curative instruction would be less prejudicial than giving one, and thus drawing attention to Holmes's comment, implies that any prejudice stemming from Holmes's comment was not as extreme as Trinidad alleges it was.

Finally, we have held that "strong independent evidence of guilt tends to lessen the effect of an improper comment by a witness, making a mistrial unnecessary." Díaz, 494 F.3d at 227. Here, the independent evidence against Trinidad was overwhelming. This evidence included testimony from several cooperating witnesses implicating Trinidad in the conspiracy, the contract showing that Trinidad leased the crack house on Ohio Street, documents showing bank deposits made by Trinidad into the bank account of the leader of the conspiracy, and proof of multiple controlled crack sales by Trinidad to a confidential informant. When viewed in light of the overwhelming nature of the evidence against Trinidad, it is unlikely that one isolated and vague comment regarding his status as a pretrial prisoner would irreparably sway the jury's opinion of Trinidad from innocent to guilty.

Considering the totality of the circumstances, we conclude that Trinidad has not shown that Holmes's comment constituted clear prejudice that would render the district court's denial of his request for a mistrial a manifest abuse of discretion. Thus, we affirm the district court's denial of Trinidad's request for a mistrial.

## B.  The Reasonableness of Trinidad's Sentence

Trinidad also argues that his sentence, which was almost five years below the advisory GSR, is unreasonable in light of his age, the sentencing factors in 18 U.S.C. § 3553(a), his role in the conspiracy, and his criminal record.

### 1.  Standard / Scope of Review

We review the reasonableness of a criminal sentence under an abuse-of-discretion standard. Gall v. United States, 552 U.S. 38, 51 (2007); United States v. Rivera-Moreno, 613 F.3d 1, 8 (1st Cir. 2010). This is a deferential standard, which recognizes the sentencing court's "superior coign of vantage." United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008) (citation omitted). "In reviewing a sentence, we seek to ensure that it is both procedurally sound and substantively reasonable." United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010) (citation omitted). A sentence is procedurally sound so long as the district court did not commit a procedural error in arriving at the sentence. Examples of procedural errors include: "failing to

-14-

calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the section 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range." Rivera-Moreno, 613 F.3d at 8 (quoting Gall, 552 U.S. at 51). "When assessing procedural reasonableness, our abuse of discretion standard is multifaceted. [W]e review factual findings for clear error, arguments that the sentencing court erred in interpreting or applying the guidelines de novo, and judgment calls for abuse of discretion simpliciter." United States v. Serunjogi, 767 F.3d 132, 142 (1st Cir. 2014) (alteration in original) (internal citations omitted).

Once we determine that the district court committed no significant procedural error, we then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. Id. "When conducting this review, we take into account the totality of the circumstances, including the extent of any variance from the GSR." Rivera-Moreno, 613 F.3d at 8 (citing Gall, 552 U.S. at 51). "The linchpin of a reasonable sentence is a plausible sentencing rationale and a defensible result." United States v. Ramos, 763 F.3d 45, 58 (1st Cir. 2014) (internal quotation marks omitted) (quoting Martin, 520 F.3d at 96).

### 2. Analysis

Trinidad does not raise any claim of procedural error. Rather, he complains about the ultimate sentencing determination. Although Trinidad acknowledges that the trial court engaged in "a thoughtful analysis" and "discussed in detail the sentencing factors i[t] considered in fashioning its sentence of 240 months," he argues that the district court's assessment of his role in the conspiracy was erroneous since he was a "youthful, low-level drug peddler with a minor record," who speaks "very little English" and, thus, should have received a greater downward variance than the one accorded by the trial court.

"[A] defendant who attempts to brand a within-the-range sentence as unreasonable must carry a heavy burden." United States v. Pelletier, 469 F.3d 194, 204 (1st Cir. 2006); see also United States v. Clogston, 662 F.3d 588, 592-93 (1st Cir. 2011) ("Challenging a sentence as substantively unreasonable is a burdensome task in any case, and one that is even more burdensome where, as here, the challenged sentence is within a properly calculated GSR."). Trinidad's burden, however, is even heavier because his sentence was below the applicable advisory GSR. See United States v. Merritt, 755 F.3d 6, 12 (1st Cir. 2014) ("It is a rare below-the-range sentence that will prove vulnerable to a defendant's claim of substantive unreasonableness." (quoting United States v. King, 741 F.3d 305, 310 (1st Cir. 2014))). He "must

adduce fairly powerful mitigating reasons and persuade us that the district court was unreasonable in balancing pros and cons despite the latitude implicit in saying that a sentence must be reasonable." United States v. Madera-Ortiz, 637 F.3d 26, 30 (1st Cir. 2011) (internal quotation marks omitted).

Trinidad has not carried his burden. The district court carefully considered all relevant factors and explained in detail the basis for its conclusion that Trinidad was not a "soldier" or a "low-level peddler," as he claimed to be. The district court emphasized that Trinidad had three major roles in the conspiracy, consisting of: (1) "watch[ing] the drugs coming in and out and watch[ing] other people with the drugs" (the "Babysitter Role"); (2) actual drug dealing; and (3) depositing the drug proceeds in Cabrera's bank account (the "Depositor Role"). It noted that the Depositor Role was a "pretty significant role" that put him in a different level than simply an "outside soldier." The district court also noted that Trinidad carried a gun in furtherance of the conspiracy, which also put him in a category different from that of other lower-level conspirators.

Trinidad tries to minimize his Depositor Role and his carrying of a gun by arguing that he sometimes required help at the bank due to his lack of proficiency in English, that the conspiracy leaders viewed him as dispensable since he was required to go into the open with large sums of money, and that the reason for getting

the gun was "opaque."  However, Trinidad's different view about the significance of his roles does not mean that the district court's view was unreasonable.

As Trinidad recognizes, in making its determination the district court engaged in "a thoughtful analysis."  It explained that it had taken into consideration each of the factors set forth in 18 U.S.C. § 3553(a), including the obligation to impose a sentence that is sufficient, but no greater than necessary to achieve the purposes of the law.  The district court also explained in detail the sentencing factors of Trinidad's past, his age, his roles in the conspiracy, and the need for punishment.  After providing this explanation, the district court concluded that the advisory GSR was too harsh and imposed a sentence almost five years below the bottom of the advisory GSR.  This was a defensible result, and the court stated a plausible rationale for reaching it. Ramos, 763 F.3d at 58.  We therefore affirm his sentence.[5]

---

[5]  In the summary of the argument section of his brief, Trinidad briefly alleges that his sentence constitutes a punishment for going to trial, since another co-conspirator whom he asserts was similar in "level" to him received an 84-month sentence.  Although Trinidad does not identify the "similar in level co-conspirator," we must note that many of Trinidad's co-conspirators received downward departures for substantial assistance to the government and that Jacob García, who received an 84-month sentence, was one of them.  Cooperation with the government is a legitimate basis for a disparity in sentence. United States v. Vázquez-Rivera, 470 F.3d 443, 449 (1st Cir. 2006).  In any event, Trinidad did not develop this argument in his brief and, therefore, it is waived. See United States v. Martínez, 762 F.3d 127, 132 n.2 (1st Cir. 2014) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."

## III. Discussion of Cogswell's Trial Issues

### A. Sufficiency of the Evidence

Cogswell challenges the sufficiency of the evidence supporting his conviction. He argues that the district court erred in denying his motion for acquittal because "the evidence only supported a finding that [he] was a crack cocaine user and customer of the conspiracy."

### 1. Standard / Scope of Review

We review de novo the district court's denial of a motion made under Rule 29 for judgment of acquittal. United States v. Ulloa, 760 F.3d 113, 118 (1st Cir. 2014). In our review,

> we examine the evidence, both direct and circumstantial, in the light most favorable to the jury's verdict. We do not assess the credibility of a witness, as that is a role reserved for the jury. Nor need we be convinced that the government succeeded in eliminating every possible theory consistent with the defendant's innocence. Rather, we must decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime.

United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009) (citations omitted) (internal quotation marks omitted). "[D]efendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." United States v. Lipscomb, 539 F.3d 32,

_____

(alteration in original) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st. Cir. 1990))).

40 (1st Cir. 2008) (citation omitted) (internal quotation marks omitted); see also United States v. Polanco, 634 F.3d 39, 44-45 (1st Cir. 2011) (noting that "a sufficiency challenge is a tough sell").

"To sustain a drug conspiracy conviction, the government must prove beyond a reasonable doubt that an agreement existed to commit the underlying offense and that the defendant elected to join the agreement, intending that the underlying offense be committed." United States v. Liriano, 761 F.3d 131, 135 (1st Cir. 2014). "An agreement to join a conspiracy may be express or tacit, and may be proved by direct or circumstantial evidence." Id. "[E]ach coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." Id. We have held that "the continuing purchase and sale relationship between [the dealers and the defendant], and the dealers' knowledge of [the defendant's] re-distribution, would permit a jury to infer both an agreement between them that [the defendant] possess the drugs and the requisite intent as to distribution." United States v. Symonevich, 688 F.3d 12, 24 (1st Cir. 2012) (alterations in original) (citation omitted).

-20-

## 2. Analysis

Cogswell alleges that there was insufficient evidence that he agreed to join the conspiracy's goal and that the evidence only supported a finding that he was a crack cocaine user and customer of the conspiracy. In support of his argument, Cogswell emphasizes the testimony of Cabrera, and discredits the testimony of five other witnesses who testified that Cogswell was indeed a member of the conspiracy. Cogswell undervalues the evidence against him.

Cabrera, described as the leader of the conspiracy, testified that he knew Cogswell because he recalled an occasion when he was buying drugs for personal use. Cabrera did not live in Bangor, although he visited it at times. The other five witnesses testified that a continuing purchase and sale relationship existed between Cogswell and the dealers. Specifically, they testified that they would see Cogswell almost every day to obtain crack cocaine to sell; that Cogswell was one of the people involved in the drug operation and that he was buying either $400 or $800 of crack cocaine at a time; that Cogswell "belonged to the company, he was working together with [them], moving crack and making deliveries;" that Cogswell was provided with packets of crack cocaine that he would resell for $50 each and that he had traded a gun for ten bags of drugs; that Cogswell was "selling crack" that the New York importers were providing; and that Cogswell was one of

-21-

the people from whom Holmes would buy crack cocaine at the 100B Ohio Street apartment.  Unlike Cabrera, these other five witnesses lived in Bangor.

Cogswell urges us to discredit the testimonial evidence from these five witnesses because they were testifying after agreeing to cooperate with the government.  However, he fails to recognize that Cabrera was in the same situation.  Furthermore, Cogswell cross-examined these witnesses about their cooperation agreements, and the district court cautioned that the testimony of cooperating witnesses should be considered with "particular caution."  It was for the jury to decide whether to credit the testimony of Cabrera (who lived in New York and, thus, was not present in Bangor all the time) or that of the five other witnesses (who spent more time in Bangor).  See United States v. Hernández, 218 F.3d 58, 66 n.5 (1st Cir. 2000) ("It is not our role to assess the credibility of trial witnesses or to resolve conflicts in the evidence, instead we must resolve all such issues in favor of the verdict.").  Besides, "[t]he testimony of a single witness can be enough to support the government's case, and even the uncorroborated testimony of an informant may suffice to establish the facts underlying a defendant's conviction." United States v. Meises, 645 F.3d 5, 12 (1st Cir. 2011) (internal citations and quotation marks omitted).

In addition, the jury's verdict is supported by other evidence, including conspiracy drug ledgers and expense sheets showing that Cogswell had received twenty-bag quantities of crack cocaine from the New York exporters, deposit slips showing that Cogswell deposited over $26,000 in cash into Cabrera's bank account, and the fact that Cogswell resided in the "crack house."

In this case, the prosecution alleged that Cogswell participated in the conspiracy by repeatedly purchasing crack cocaine from the New York importers for resale. Based on all the evidence presented, we conclude that a rational factfinder could conclude beyond a reasonable doubt that Cogswell knowingly and voluntarily joined the charged conspiracy. Thus, we affirm the district court's denial of Cogswell's Rule 29 motion.

**B. Government's Closing Argument**

Cogswell alleges that during closing arguments, the government misrepresented statements made by him to law enforcement during an interview, and that the resulting prejudicial effect warrants that his conviction and sentence be vacated. We disagree.

**1. Background**

Agent Shawn Green ("Green") interviewed Cogswell on November 2, 2011, after law enforcement raided the 100B Ohio Street apartment. Green testified at trial that, during that interview, Cogswell "admitted to using marijuana" and said that "in the past, he had picked up pot for other people." Green also testified that

he had asked Cogswell if he used cocaine and that "[i]nitially, [Cogswell] denied it, though he admitted he had in the past and . . . made a statement that he had used it the week prior." Green further testified that "during that line of questioning where [Cogswell] said that at times he would get things for other people, [Cogswell] stated he's had that cocaine the week before to take it to a party on Essex Street in Bangor." Finally, Green testified that Cogswell told him that he was living at 100 Ohio Street with his girlfriend.

During closing arguments, the government misquoted Green as having testified that Cogswell: (1) "admitted he got some cocaine the week before and brought it to a party to help someone out;" and (2) "said he, [his girlfriend], and Jacob lived at the house. He didn't mention [the other conspiracy members residing at the house]."

These statements were made in the middle of the government's closing argument. Cogswell waited until the government finished its closing argument to object at sidebar to the statement regarding who lived in the 100B Ohio Street apartment. He did not specifically object to the statement of his taking drugs to a party to help someone out. The district court told Cogswell that it had already instructed the jury that "what the lawyers say is not evidence and that they're to base their verdict solely on the evidence." The district court also advised Cogswell that he was

free in his closing argument to argue that what Green had stated was not before the jury and that the jury should not consider it. Cogswell followed the suggestion.

Cogswell contends that the government's misstatements suggest that he admitted to dealing cocaine and that he attempted to cover up for other conspiracy members. Cogswell argues that, although these statements were not deliberate or recurrent, they did interfere greatly with the heart of his defense (that he was merely a user, not a dealer). He complains that the court issued no "explicit or cautionary instruction" after the objection to these statements.

### 2. Standard / Scope of Review

When a contemporaneous objection to a challenged comment is made, we review de novo whether the comment was improper. United States v. Díaz-Castro, 752 F.3d 101, 110 (1st Cir. 2014) (citing United States v. Glover, 558 F.3d 71, 76 (1st Cir. 2009)); United States v. Appolon, 695 F.3d 44, 65-66 (1st Cir. 2012). If we conclude that the comment was improper, we then review for harmless error. Díaz-Castro, 752 F.3d at 110. Under the harmless-error standard, reversal is warranted only if the comment has "likely affected the trial's outcome." United States v. Ayala-García, 574 F.3d 5, 16 (1st Cir. 2009) (quoting United States v. Vázquez-Rivera, 407 F.3d 476, 486 (1st Cir. 2005)).

If, on the contrary, no contemporaneous objection was made, we review under the four-pronged plain-error standard. United States v. Hilario-Hilario, 529 F.3d 65, 74-75 (1st Cir. 2008) (citing United States v. Allen, 469 F.3d 11, 16 (1st Cir. 2006)). "An unpreserved error is deemed plain (and, therefore, to affect substantial rights) only if the reviewing court finds that it skewed the fundamental fairness or basic integrity of the proceeding below in some major respect." United States v. Taylor, 54 F.3d 967, 972 (1st Cir. 1995) (citing United States v. Griffin, 818 F.2d 97, 100 (1st Cir. 1987)); see also United States v. Frady, 456 U.S. 152, 163 n.14 (1982) (holding that the plain-error doctrine applies in those circumstances in which, absent appellate intervention, a miscarriage of justice would otherwise result). To make this determination, we consider all attendant circumstances with emphasis on: "(1) the extent to which the prosecutor's conduct is recurrent and/or deliberate; (2) the extent to which the trial judge's instructions insulated the jury against, or palliated, the possibility of unfair prejudice; and (3) the overall strength of the prosecution's case, with particular regard to the likelihood that any prejudice might have affected the jury's judgment." Taylor, 54 F.3d at 977; United States v. Giry, 818 F.2d 120, 133 (1st Cir. 1987).

"[T]he jurisprudence of plain error invests substantial discretion in the court of appeals." Taylor, 54 F.3d at 973. This

-26-

discretion should be exercised sparingly, and should be reserved for the correction of those few errors that "so poisoned the well that the trial's outcome was likely affected."  United States v. Mejía-Lozano, 829 F.2d 268, 274 (1st Cir. 1987).

### 3.  Analysis

The government argues that plain-error review applies to Cogswell's challenge of both statements.  It alleges that Cogswell never objected to the statement regarding his taking drugs to a party for someone else and that, although he objected to the statement regarding who lived at the apartment, his objection came too late because he waited until the government had finished its closing argument to raise it.

We agree with the government that Cogswell did not object to the statement regarding his taking drugs to a party for someone else.  The record shows that Cogswell's objection made reference only to the statement regarding who lived at the apartment.  Thus, his challenge to the former statement is subject to plain-error review.  However, contrary to the government's assertions, Cogswell timely objected to the statement regarding who lived in the apartment.  Although he did not object to it immediately after the statement was made, we find that his objection, made at the end of the prosecution's closing argument, was sufficiently timely to preserve the issue for appeal.  See United States v. Mandelbaum, 803 F.2d 42, 44 n.1 (1st Cir. 1986) (holding that the objection had

been sufficiently timely when the defense waited until the government's rebuttal to object to a statement made during the government's closing statement). Thus, we review de novo whether this statement was improper and, if we conclude that it was, we review for harmless error. Díaz-Castro, 752 F.3d at 110.

As Cogswell recognizes, the statement regarding his taking drugs to a party for someone else was isolated in nature and there is no evidence that it was deliberate. In fact, it is not even clear that it was a misstatement of the evidence. Green testified that Cogswell had in the past picked up marijuana for other people. The government then asked about cocaine. Green responded that "during that line of questioning where he said that at times he would get things for other people, [Cogswell] stated he's had that cocaine the week before to take it to a party on Essex Street in Bangor." Thus, the government argued that Cogswell had made the statement about bringing cocaine to the party in the context of a question about obtaining drugs for others.

Also, the district court's instructions to the jury before beginning closing arguments were strong and explicit. At the outset, the court made clear that statements and arguments of counsel were not evidence, and instructed the jury to consider only the evidence in the record. See Giry, 818 F.2d at 134 ("finding the impact of prosecutorial misstatements mitigated by instructions telling the jury, among other things, to '[b]ear in mind that

-28-

arguments of counsel . . . are not evidence'" (quoting <u>United States</u> v. <u>Maccini</u>, 721 F.2d 840, 847 (1st Cir. 1983))). Furthermore, we have already concluded that the evidence against Cogswell was strong, which makes it less likely that any misstatement could have affected the outcome of the trial.[6] <u>See</u> <u>Giry</u>, 818 F.2d at 133-34 ("[P]rejudice that survives the charge is deemed less likely to have affected the outcome of the trial where strong evidence supports the prosecution's case. Perhaps the single most significant factor . . . is the strength of the case against the defendant." (internal citations omitted)). Thus, Cogswell has not demonstrated that the government's statement constituted plain error requiring a new trial.

Regarding the statement about the people who lived in the apartment, we agree with Cogswell that the government misstated Green's testimony because Cogswell never mentioned that Jacob also lived in the apartment. However, even finding that the government's statement was improper, it is harmless. This statement, too, was isolated, not deliberate, and mitigated by the judge's instructions to the jury. It is highly unlikely that the

---

[6]   The evidence against Cogswell was described by the district court as overwhelming. At sentencing, the district judge told Cogswell: "[T]here's no question in my mind, absolutely no question in my mind that the jury verdict was correct. The evidence against you was absolutely overwhelming." We have no cause to disagree with the district court's assessment on this point.

challenged statement affected the trial's outcome, because of the strong evidence against Cogswell.

In sum, reversal for misrepresentation of the evidence during the government's closing argument is inappropriate in this case, since these misstatements were unlikely to have affected the outcome of the case or the fundamental fairness and integrity of the trial proceedings.

## IV. Discussion of Cogswell's Sentencing Issues

Cogswell alleges that the district court committed multiple procedural errors under the Sentencing Guidelines and that the sentence imposed was unreasonably harsh in comparison to those imposed on his co-conspirators. In assessing Cogswell's alleged procedural errors, we "review factual findings for clear error, arguments that the sentencing court erred in interpreting or applying the guidelines de novo, and judgment calls for abuse of discretion simpliciter." Serunjoqi, 767 F.3d at 142 (citation omitted). We then consider the substantive reasonableness of the sentence under an abuse-of-discretion standard. Id.

## A. Denial of Role Reduction

Cogswell argues that the district court should have granted him a two- or three-level reduction in the applicable guidelines sentencing range for his role in the conspiracy. We review this issue for clear error. United States v. Rosa-Carino, 615 F.3d 75, 81 (1st Cir. 2010) ("The district court's decision

whether to grant a downward adjustment for a minor role is usually a fact-based decision that we review for clear error." (citing United States v. Sánchez, 354 F.3d 70, 74 (1st Cir. 2004))). "If the record supports at least two permissible inferences, the factfinder's choice between or among them cannot be clearly erroneous. Accordingly, we rarely reverse a district court's decision regarding whether to apply a minor role adjustment." United States v. Bravo, 489 F.3d 1, 11 (1st Cir. 2007) (internal citations omitted); see also United States v. Olivero, 552 F.3d 34, 41 (1st Cir. 2009) ("[B]attles over a defendant's status . . . will almost always be won or lost in the district court." (citation omitted)); Sánchez, 354 F.3d at 74 (stating that unless the findings of fact are "clearly erroneous," higher courts must defer to those findings as the sentencing courts have a superior "coign of vantage").

The Sentencing Guidelines permit a court to award a four-level decrease to a defendant who was a minimal participant in the criminal activity, a two-level decrease to a defendant who was a minor participant in the criminal activity, and a three-level decrease to persons whose participation was more than minimal but less than minor. U.S.S.G. § 3B1.2; United States v. Innamorati, 996 F.2d 456, 490 (1st Cir. 1993). "To qualify as a minor participant, a defendant must prove that he is both less culpable than his cohorts in the particular criminal endeavor and less

culpable than the majority of those within the universe of persons participating in similar crimes." United States v. Santos, 357 F.3d 136, 142 (1st Cir. 2004). "To qualify as a minimal participant, a defendant must prove that he is among the least culpable of those involved in the criminal activity." Id.

Cogswell alleges that he was entitled to a two- or three-level reduction in the applicable guideline range because the evidence "at most supported a finding that [he] was a regular customer who sold on the side to support his addiction." However, the district court rejected this characterization. The district court carefully considered Cogswell's request for a role reduction and rejected it. In reaching its conclusion, the court emphasized the following facts: Cogswell's participation in the conspiracy extended throughout the entire time of the charged conspiracy; Cogswell was not a mere user, but rather was "a classic middleman" who "got drugs from the conspiracy [and] sold them to local customers" while using some of those drugs himself; Cogswell traded a firearm for ten bags of crack; Cogswell, with his girlfriend, actually moved into, and was living, at the "headquarters" of the conspiracy; Cogswell was trusted by his co-conspirators to deposit drug proceeds into a bank account, or assisted in making those deposits; and Cogswell approached Holmes so that she would buy a firearm for the conspiracy, which she did. Each of these findings about Cogswell's role was supported by the trial record and, thus,

was not clearly erroneous.  On these facts, the district court found that Cogswell was not less culpable, but rather "more culpable than many of his cohorts in this particular criminal activity and [that] he was certainly not less culpable than the majority of those within the universe of persons participating in similar crimes."  Cogswell has failed to establish that the district court erred, much less clearly erred, in its determination of his role in the offense.[7]  Thus, we affirm the district court's denial of a role reduction.

## B.  Determination of Drug Quantity

For sentencing purposes, the district court attributed to Cogswell 841 grams of crack cocaine.  This amount included the quantity of drugs that he personally dealt prior to moving to the 100B Ohio Street apartment (141 grams) and the entire amount of crack cocaine that the conspiracy intended to distribute during the

---

[7]  Cogswell's reliance on Innamorati, 996 F.2d at 489-90, is misplaced.  There, the defendant, who had not participated in particular drug transactions, but rather had provided services to a drug distributor, received a three-level reduction by the district court on the grounds that "he was not shown to have cocaine himself or to have shared in the profits."  Id. The defendant appealed, asking for a four-level reduction, which this court rejected after concluding that the three-level reduction was "generous."  Id.  Unlike the defendant in Innamorati, Cogswell participated in drug transactions, had cocaine in his possession on an almost daily basis, and profited from his conduct (since he paid the New York importers $40 for a bag of crack and sold it for $50).

length of time that Cogswell lived within the apartment (700 grams).[8]

Cogswell argues that holding him responsible for the entire amount of cocaine involved in the conspiracy after he moved to 100B Ohio Street (700 grams) is unreasonable because: the drugs and money were stored on a different level than his living space within the apartment; there was no evidence of him moving or handling such large quantities of drugs; and there was no evidence of a close relationship between him and the leader of the conspiracy, so it was not foreseeable to him that such an immense quantity of crack cocaine was involved.

"[I]n a conspiracy case, the sentencing court cannot automatically assign the conspiracy-wide amount to a defendant. Rather, the sentencing court must make an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant." United States v. González-Vélez, 587 F.3d 494, 502 (1st Cir. 2009) (internal citations and quotation marks omitted); Santos, 357 F.3d at 140 ("[E]ach coconspirator is responsible not only for the drugs he actually handled but also for the full amount

---

[8]   Cogswell did not raise any claim based on Alleyne v. United States, 570 U.S. ____, 133 S. Ct. 2151, 168 L.Ed.2d 203 (2013), either here or in the district court, and we take no position on it either.   In fact, at his sentencing hearing the district judge specifically asked: "First, I understand that there's no Alleyne issue here, is that right?," to which Cogswell responded: "Well, that's right, Your Honor . . . ."

of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy.").

We review individualized determinations of drug quantities for clear error. United States v. Cortés-Cabán, 691 F.3d 1, 27 (1st Cir. 2012). "[T]he district court's determination will be upheld so long as the approximation represents a reasoned estimate of actual quantity." United States v. Sepúlveda-Hernández, 752 F.3d 22, 35 (1st Cir. 2014) (internal quotation marks omitted) (citing United States v. Cintrón-Echautegui, 604 F.3d 1, 6–7 (1st Cir. 2010)). Such a determination need only be supported by a preponderance of the evidence. González-Vélez, 587 F.3d at 502.

Here, there was no clear error in the drug quantity determination. Although Cogswell might have lived on a different floor than where the drugs were stored, he lived for at least two months in the "headquarters" of the conspiracy and with the people who were in charge of it. He was able to see the traffic of customers coming in and out of the apartment to buy drugs, and he himself was buying quantities of crack cocaine almost daily. See United States v. De La Cruz, 996 F.2d 1307, 1314-15 (1st Cir. 1993) (finding defendant to have foreseen the large quantity of drugs involved in the conspiracy as he saw firsthand the number of people and vehicles present at the warehouse where the drugs were stored). Furthermore, he was entrusted to deposit over $26,000 in drug-sales proceeds into the conspiracy leader's account, and it has been

established that his role in the overall conspiracy was more than just minimal or minor.  Based on this evidence, the district court could reasonably infer that Cogswell was aware of the capacity at which the conspiracy was operating and, thus, that the drug amount handled by the conspiracy was reasonably foreseeable to him. Accordingly, we affirm the district court's drug quantity calculation, which was not clearly erroneous.

## C.  Obstruction-of-Justice Enhancement

Section 3C1.1 of the Sentencing Guidelines mandates a two-level enhancement when the defendant "willfully obstructed . . . or attempted to obstruct . . . the administration of justice with respect to the . . . prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."  U.S.S.G. § 3C1.1.  One recognized way in which a defendant can obstruct justice is by "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."  See id. at § 3C1.1 cmt. 4.  The district court applied a two-level enhancement after finding that Cogswell had obstructed justice by writing a letter to Holmes, in which Cogswell threatened another government witness.

### 1. Background

During trial, the government called Keith "Beau" Lewis ("Lewis"), a local drug dealer in Bangor, to testify as a government witness against Cogswell. The drug conspiracy ran for some time from Lewis's house before it relocated to 100B Ohio Street. Lewis testified as to the scope of Cogswell's activities while the conspiracy operated from his house.

After Cogswell was convicted, and while the presentence report was being prepared, Cogswell wrote a letter to Holmes, who had also testified against him at trial and who, at that time, was incarcerated and awaiting sentencing. The letter stated as follows, in relevant part:

> That "Dick" Prosecutor, . . . is still protesting it. He is still trying to protect [Lewis] and "Ranger" . . . his "lil" snitchie-bitchies and is afraid that now that I know who they are, that [words blacked-out]. Oh well, little does he know when everything is all done and I have nothing to do with anyone in the Bangor area, all set with supervised release, then I'll take care of [Lewis] the [words blacked-out]. . . My people are gonna love hanging him up and setting him on fire, he's not even gonna get the mercy of a bullet when he screams for it. I'll watch and laugh and that will be that.

Based on this letter, and after carefully considering and rejecting all of Cogswell's assertions, the district court imposed an obstruction-of-justice enhancement. Cogswell appeals the imposition of this enhancement.

## 2. Analysis

A district court's "factual determination underlying its decision to award a two-level enhancement for obstruction of justice is reviewed for clear error." United States v. Cash, 266 F.3d 42, 44 (1st Cir. 2001) (citing United States v. Cardales, 168 F.3d 548, 558 (1st Cir. 1999)). "[W]here the record supports at least two permissible inferences, the factfinder's choice between them cannot be clearly erroneous." United States v. Balsam, 203 F.3d 72, 89 (1st Cir. 2000). The question of whether the scope of section 3C1.1 encompasses a defendant's conduct, however, is subject to de novo review. United States v. Moreno, 947 F.2d 7, 10 (1st Cir. 1991).

Cogswell alleges that the letter did not constitute an obstruction of justice because it was written after Lewis had already testified at trial and the trial had concluded. He also argues that the letter was not an attempt to influence Lewis because it was not directed at Lewis, Lewis never received it, and Cogswell had no reason to believe that Holmes would relay the threat to Lewis.

Cogswell's first contention lacks merit. It is irrelevant that, at the time Cogswell made the threat, the trial had already concluded, because sentencing was still pending and obstruction of justice extends to sentencing under section 3C1.1. U.S.S.G. § 3C1.1 ("the defendant willfully obstructed . . . or

-38-

attempted to obstruct . . . the administration of justice with respect to . . . sentencing"). As the district court pointed out, Lewis was a crucial witness regarding drug quantity (which is the primary consideration in determining the guideline offense level for a drug offense), he was a potential government witness at sentencing, and Cogswell did not know whether Lewis would be called to testify at sentencing. See United States v. McMinn, 103 F.3d 216, 218-19 (1st Cir. 1997) (finding enhancement applicable when defendant threatened someone who "remained a prospective government witness" in further proceedings against defendant); see also United States v. Boyd, 574 F.App'x 878, 879-80 (11th Cir. 2014) (unpublished) (upholding enhancement where defendant threatened a witness after defendant had pleaded guilty and was awaiting sentencing because defendant "did not know whether [the witness's] testimony would be used against him at sentencing"); United States v. Rubio, 317 F.3d 1240, 1244-45 (11th Cir. 2003) (holding that an obstruction-of-justice enhancement was appropriate based on the defendant's assault on a witness after trial, and rejecting the defendant's argument that because the assault occurred after trial, it could not impact the prosecution of his case).

Cogswell's other contention -- that the enhancement is inapplicable because he did not send the threat directly to Lewis, but rather included it in a letter to Holmes -- suffers the same fate. Cogswell cites United States v. Brooks, 957 F.2d 1138 (4th

Cir. 1992), in which the Fourth Circuit required the threat to be made directly to the intended target or under circumstances in which there is some likelihood that the intended target will learn of the threat. Following this line of reasoning, Cogswell argues that application of the obstruction enhancement requires proof that Lewis actually learned of the threat against him, or at a minimum, that Cogswell intended that Lewis would learn of the threat. However, the Fourth Circuit's decision in Brooks has been characterized as an outlier and no other circuit that has addressed the issue has followed that path. See, e.g., United States v. Searcy, 316 F.3d 550, 552-53 (5th Cir. 2002) (characterizing Brooks as an "outlier").

The Second, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have all ruled that indirect threats made to third parties may constitute obstruction under § 3C1.1 absent a showing that they were communicated to the target. See United States v. Fleming, 667 F.3d 1098, 1109 (10th Cir. 2011) (holding that to qualify as an attempt to obstruct justice a "defendant need not actually threaten the witness; he need only attempt to influence [him]"); United States v. Talley, 443 F.App'x 968, 972 (6th Cir. 2011) (unpublished) (holding that "statements, even when made to a third party, which are appropriately determined to be threatening" can constitute obstruction of justice); Searcy, 316 F.3d at 553 ("The Fourth Circuit's conclusion in Brooks

-40-

notwithstanding, there is nothing in the text of the guideline or commentary which restricts application of § 3C1.1 only to situations in which the defendant directly threatens a witness or communicates the threat to a third party with the likelihood that it will in turn be communicated to the witness."); United States v. Bradford, 277 F.3d 1311, 1314-15 (11th Cir. 2002) (expressly rejecting the holding in Brooks and concluding that communicating a threat directly to a witness is not required to support application of the obstruction-of-justice enhancement); United States v. Jackson, 974 F.2d 104, 106 (9th Cir. 1992) ("Where a defendant's statements can be reasonably construed as a threat, even if they are not made directly to the threatened person, the defendant has obstructed justice."); United States v. Capps, 952 F.2d 1026, 1028 (8th Cir. 1991) (holding that because § 3C1.1 applies to attempts to obstruct justice, it is not essential that the threat be communicated to the target); United States v. Shoulberg, 895 F.2d 882, 884-86 (2d Cir. 1990) (holding that a note to a third party, where the defendant never requested that the message be conveyed to the intended target, was an attempt to keep the target from cooperating with the government and justified application of § 3C1.1).

Like the Tenth Circuit, we find this reasoning more persuasive. Since § 3C1.1 clearly applies to attempts by defendants to directly or indirectly threaten, intimidate, or

-41-

influence a potential witness, see U.S.S.G. § 3C1.1 cmt. 4, we conclude that the obstruction enhancement may apply where a threatening statement is made to a third party and absent evidence that it was communicated to the target.

Under this standard, Cogswell's statement against Lewis constitutes an attempted obstruction of justice. While his sentencing hearing was pending, Cogswell sent a testifying witness a letter that included a threat to kill another testifying witness. The district court found that Cogswell's threat against Lewis was specific, serious, and material, and, if believed, would tend to influence or affect the witness.[9] The district court also explained that Cogswell's reference to "my people" raises the specter that Cogswell has "compatriots out there who are aware of Mr. Lewis' role and will seek to do him harm." Even though Cogswell did not direct his threat to Lewis, there was a reasonable possibility Holmes would communicate it to him. After all, this is not a situation where Holmes owed any obligation of confidentiality to Cogswell. Holmes was a government witness who might well have been motivated to share the threat with her fellow witness. Reading the graphic and malevolent plan, especially bolstered with an ominous reference to his 'people,' could very well cause Holmes to share the threat with Lewis or even dissuade her from testifying

_____

[9]  The district court noted that, since Lewis is African-American, the threat to "lynch and burn" Lewis is specially "chilling in light of this country's tragic racial history."

-42-

during Cogswell's sentencing proceedings, or make her recant her testimony against Cogswell. Thus, the obstruction of justice enhancement is affirmed.

**D. Firearm Enhancement**

The Sentencing Guidelines apply a two-level enhancement to the base offense if the defendant possessed a firearm in connection with the convicted offense. U.S.S.G. § 2D1.1(b)(1). A firearm enhancement is appropriate "whenever a codefendant's possession of a firearm in furtherance of joint criminal activity was reasonably foreseeable to the defendant." United States v. Mena-Robles, 4 F.3d 1026, 1036 (1st Cir. 1993) (quoting United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991); see also United States v. Greig, 717 F.3d 212, 219 (1st Cir. 2013) ("To warrant the enhancement, the defendant does not need to have possessed the weapon herself or even to have known about it, it just must be reasonably foreseeable that a co-conspirator would possess a weapon in furtherance of the criminal activity." (citing United States v. Flores-De Jesús, 569 F.3d 8, 36 (1st Cir. 2009)). This enhancement applies unless it is clearly improbable that the weapon was connected to the commission of the offense. United States v. Anderson, 452 F.3d 87, 91 (1st Cir. 2006). Factual findings of a firearm enhancement are reviewed for clear error. Id. at 90.

Relying on testimony from Jowenky Núñez ("Núñez"), one of his co-conspirators, Cogswell alleges that the district court improperly applied a firearm enhancement in calculating the applicable GSR. At trial, Núñez testified that in December 2010, Cogswell was at Lewis's house because he brought a gun to the leaders of the conspiracy in exchange for ten bags of crack cocaine. When asked if that was the only time that Cogswell was present at Lewis's house, Núñez replied, "No, because [he] was working with us later." Based on this testimony, Cogswell alleges that the evidence shows that he traded a gun for drugs before he joined the conspiracy and that the district court's finding to the contrary (that it was in furtherance of) is erroneous. We disagree.

The evidence shows that Cogswell traded the gun for crack cocaine in December 2010. At least three other witnesses testified that Cogswell was part of the conspiracy as early as August or September 2010. The district court credited these witnesses, over Núñez, regarding when he joined the conspiracy.[10] As Núñez testified, Cogswell gave the gun to his co-conspirators during a drug deal. This gun became the "house gun" and was always at the 100B Ohio Street apartment, where it was frequently carried and

---

[10] Furthermore, Núñez's testimony does not necessarily mean that Cogswell only joined the conspiracy after he traded the gun for drugs. Rather, his testimony may be interpreted as meaning that Cogswell continued to be at Lewis's house after the trade because he continued to participate in the conspiracy.

held by co-conspirators.  All this indicates that the gun played a role in the drug conspiracy which operated out of the apartment, and thus possession of the gun in furtherance of the conspiracy's objectives was foreseeable to Cogswell.  See Bianco, 922 F.2d at 912 (stating that firearms are "common tools of the drug trade" and it may be inferred that a codefendant's possession of a firearm in furtherance of their joint criminal venture is foreseeable to a defendant with reason to believe that his acts are part of the drug trade).

Based on this evidence, the district court's conclusion that Cogswell was already a member of the conspiracy when he traded the gun in December 2010 and that the firearm enhancement was applicable are not clearly erroneous.  Thus, the enhancement is affirmed.

## E. Reasonableness of Cogswell's Sentence

As discussed above, "[we] consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard."  Gall, 552 U.S. at 51.  When conducting this review, we take into account "the totality of the circumstances."  Id. Generally, no abuse of discretion is found "as long as the court has provided a plausible explanation, and the overall result is defensible."  Martin, 520 F.3d at 96.

Cogswell argues that his sentence, which was almost seven years below the advisory GSR, is substantively unreasonable in

light of the fact that he was sentenced to a term longer than many of his more involved co-conspirators, including the leader of the conspiracy.  His claim lacks merit.

At Cogswell's sentencing hearing, the district court made clear its consideration of every factor listed in 18 U.S.C. § 3553(a) and made explicit note of its focus on Cogswell's history and characteristics, the nature and circumstances of the offense, and the need to avoid any unwarranted sentencing disparities among similarly situated defendants.  Regarding this last factor, the district court noted that the disparities among the sentences that the court had imposed on the co-defendants were attributable to a number of factors, including that each defendant had different criminal histories and different roles within the conspiracy, all other defendants had pleaded guilty (except for Trinidad and Cogswell), and some defendants cooperated with the government and testified at trial, for which they received substantial-assistance downward departures.

Cogswell is not similarly situated to his co-conspirators since, at a minimum, he did not plead guilty and accept responsibility for his crimes nor did he cooperate with the government.  See United States v. Rivera Calderón, 578 F.3d 78, 107 (1st Cir. 2009) (noting there is a "material difference between defendants who plead guilty and those who elect to go to trial, and any sentencing disparity that results from that difference is not

unreasonable"); <u>United States</u> v. <u>Thurston</u>, 456 F.3d 211, 216-217 (1st Cir. 2006) (holding that a defendant who pleads guilty in exchange for a reduced sentence is not similarly situated to a defendant who contests his charges). Defendants who accept responsibility and/or assist the government may receive sentence reductions. <u>See</u> <u>Vázquez-Rivera</u>, 470 F.3d at 449 (finding the defendant's sentence not to be unreasonable "simply because his co-defendants agreed to help the government in exchange for reduced sentences"); <u>United States</u> v. <u>Rodríquez</u>, 162 F.3d 135, 152 (1st Cir. 1998) (holding that the law allows the government to offer reduced sentences in exchange for assistance "even if it results in sentences of such disparity as would strike many as unfair").

Taking into account Cogswell's age, level of education, physical ailments, family situation, criminal history, his increasing role in the conspiracy and involvement with a firearm, his threats to murder a testifying co-conspirator, and his "utter lack of remorse," the district court imposed a sentence of 180 months. This sentence is still almost 7 years below the advisory guideline range of 262 to 327 months. Such an articulated consideration of all relevant factors, coupled with a downward variance from the advisory guidelines sentencing range, clearly indicates that the sentencing term is sufficient but no greater than necessary to achieve the purposes of the law. We find no

abuse of discretion by the district court and, thus, affirm Cogswell's sentence.

## V. Conclusion

The record reflects that both Trinidad and Cogswell were afforded a fair and impartial trial, that the evidence of their guilt was more than sufficient to support the jury's verdicts, that their convictions were not tainted by prejudicial error either in the judge's charge or in the government's closing argument, and that their sentences were reasonable. Thus, their convictions and sentences are affirmed.

**Affirmed**.